UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                                  Case No. 24-20024

v.

                                  Hon. Linda V. Parker

George Mandarakas,

      Defendant.

_____/

**Government's Response to Defendant's Motion
for Revocation of Detention Order (ECF No. 25)**

      For the reasons stated in the accompanying brief, this Court should deny

Defendant's motion for revocation of detention order (ECF No. 25).

                        Respectfully submitted,

                        DAWN N. ISON
                        United States Attorney

                        */s/ Nhan Ho*
                        Assistant United States Attorney
                        211 W. Fort St., Suite 2001
                        Detroit, Michigan 48226
                        (313) 226-9632
                        nhan.ho@usdoj.gov

Dated: April 24, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                                         Case No. 24-20024

v.

                                         Hon. Linda V. Parker

George Mandarakas,

     Defendant.

_____/

**Government's Brief in Response to Defendant's Motion
for Revocation of Detention Order (ECF No. 25)**

Having lied to a young woman for years about who he was, Defendant George Mandarakas could not let go when she broke up with him. He stalked her, harassed her, and attempted to kidnap her, in a fanatic effort to win her back, or otherwise do inexplicable things to her. As part of his plan, he researched and made an "on the run" checklist to foreign destinations. Mandarakas is pathologically deceptive, manipulative, and obsessive. He is a danger to the victim and the community, and his conduct revealed he had no intention to face the United States's criminal justice system. His motion to revoke the magistrate judge's detention order should be denied.

**BACKGROUND**

I.     **Factual Background**

A.     **Evidence at the detention hearing**

In 2019, Mandarakas met the victim, then a 22-year-old college student. Ten years older, married, and working at the university, Mandarakas lied and told the victim that he was her age and that he was, like her, a single student. They started dating. Their relationship lasted four and a half years, and all the while Mandarakas was married to another woman. (*See* ECF No. 25, PageID.118.)

In late September 2023, the victim uncovered the truth about Mandarakas's age. She ended the relationship and told Mandarakas that she wanted no further contact with him. Ignoring the victim's wishes, between October and December 2023, Mandarakas took multiple trips from New Jersey to Trenton, Michigan to see and harass the victim. He went to her house to deliver letters that were filled with more lies (*see* Ex. 1 (filed under seal)), and also randomly showed up at the places where she was.[1]

On December 24, the victim's family searched her car and found a Tile tracking device taped to the side bumper. At same time, the victim received an unexpected warning from Mandarakas's friend. According to the friend, between

---

[1]     These encounters were described in detail during the detention hearing and will not be repeated here. (ECF No. 19, PageID.51-54.)

October and December, Mandarakas repeatedly mentioned a man who kidnapped his girlfriend and took her to Mexico and how the relationship worked out in the end.  Mandarakas told the friend about watching the victim's house, following her car or the vehicles he believed she was in, and looking for a way to "ping" or track her.  For example, Mandarakas would send the victim links that appeared to be advertisements to trick her into clicking on them, which would in turn tell Mandarakas her locations.  When the friend cautioned Mandarakas about going to jail, Mandarakas acted as if he did not care.  Ultimately, on around December 23, Mandarakas told to his friend that he was going to kidnap the victim and that he was serious.  Out of concern for the victim's safety, the friend found her number and contacted her.

On December 25, the victim's family members attempted to draw out Mandarakas.  They drove the victim's car, with the Tile tracker, to a church in Trenton.  Waiting in a different vehicle, they saw Mandarakas pull up in a black Kia, which was a rental car.  He circled the parking lot several times, checking out the victim's car, then parked and walked into the church.  After being inside for approximately 20 minutes, he came back out and checked the victim's vehicle to see if it was still in the parking lot.  At this point, police arrived and arrested Mandarakas for stalking.

An inventory search of Mandarakas's rental car recovered over $12,000 in Canadian and U.S. currency, multiple cellphones, another tracking device, advertisements listing boats for sale, and sailing maps from New Jersey to Morrocco and Florida to Cuba. (Ex. 2, Items Found in Kia, pgs. 1-4.)[2]  In the car, police also found a two-page handwritten note, which appeared to be an on-the-run checklist, including items like:

- "Cash only";

- "Multiple burner phones. Don't activate until you are already on the run and left your other phone behind";

- "Can I get a less time across Atlantic. So I don't have to refuel my yacht";

- "Change legal name to Josh Tullis";

- "…face mask, hair dye shorter":

- "Sailboat in cash";

- "Fake ID/passport";

- "Global currency → have friend exchange at a bank";

---

[2] Contrary to Mandarakas's assertion, the government did not "proffer [by] reciting only the facts contained in the criminal complaint," and the magistrate judge did not "[r]ely[] only upon the Government's side of the case from nothing more than a summary proffer." (ECF No. 23, PageID.110.)  Because of the media interest at the time, the government did not introduce exhibits publicly in court to protect all involved parties' privacy.  However, the government did share the underlying materials with the magistrate judge and the defense well in advance of the hearing.  The government also supplied additional materials as requested to the defense. Mandarakas also offered exhibits at the hearing, which were considered and addressed by the magistrate judge. (*See e.g.,* ECF No. 19, PageID.60–61, 62, 82.)

- Under "Locations":

    o "(1) Med [believed to be Mediterranean]– safe weather pattern,

      [illegible], safe currents, decks to EU + Turkey",

    o "(2) Cuba", and

    o "(3) SA [believed to be South America]".

(Ex. 2, pg. 5.)

      Police then located a Hyundai Elantra, registered to Mandarakas's mother, near a rental car place in Woodhaven, where Mandarakas had rented the Kia—only minutes from Trenton.  Executing a search warrant, officers found in the Elantra:

- A disaster pouch-body bag[3] with Mandarakas's name and New Jersey home address on the shipping package;

- A stun gun;

- A map of South America;

- In an Amazon package, a headlamp, a knife, bags of zip ties, rope, field dressing gloves, and handcuffs; and

- Black tape.

(Ex. 3, Items Found in Elantra, pg. 1.)  Officers also found three large Ziploc bags containing sex toys, ovulation predictors, and sex products. (Ex. 3, pg. 2).  Further,

---

[3] At the detention hearing, the United States proffered that this was a tarp, so thought by police. (ECF No. 19, PageID.56.) However, upon further examination of the evidence once it came into federal custody, the FBI confirmed that this item was instead a disaster pouch-body bag.

they located a Glock handgun with two magazines, and over 700 rounds of ammunition, including those that fit the firearm.[4] (Ex. 3, pg. 3.)

## B.    Additional evidence

Pursuant to a federal search warrant, the FBI reviewed the contents of Mandarakas's phone on his person.  The evidence on Mandarakas's phone shows how he stalked and harassed the victim, his escalating criminal behaviors, and his plan to evade capture.  For example:[5]

- On October 4, between 10:10 to 10:21 PM, Mandarakas researched "how to put airtag on car," "can you place airtag outside of car," "do airtags beep when left behind," and "Best place to hide AirTag in car outside of glove compartment?"

- On October 5, at 4:08 PM, Mandarakas searched "ais tile limited by distance."  On October 6, at 12:18 AM, Mandarakas searched "best spots to store car gps tracker."  Notably, the Tile tracker taped to the victim's car was digitally registered on October 6, 2023.

- On October 9, at 5:06 AM, Mandarakas searched "how to hack a mac."  On the same day, at 11:17 and 11:19 AM, Mandarakas searched "macbook

---

[4]  Mandarakas said in his motion that "the ammunition discovered did not fit the firearm that was found." (ECF No. 25, PageID.114, 119.)  This was inaccurate.

[5]  All of the dates were in 2023.  The times were converted from UTC time.

6

expert hacking password reset."  [Note: before she broke up with
Mandarakas, the victim left her MacBook at Mandarakas's house.]

- On November 5, at 2:06 PM, Mandarakas searched "body bag."
  Mandarakas also shopped on Amazon for "body bag" and "body bags for
  dead bodies."

- On November 11, Mandarakas searched "how to track cellphone."

- On November 16, at 12:25 PM, Mandarakas searched "tracknphonw [sic.]
  with url," and "track phone with link."  Around the same time, at 12:28 PM,
  Mandarakas messaged an individual on WhatsApp: "Random question, do
  you know anyone who can track a location of a phone?  I heard of Url
  decoys that if you click it, you can get the person's IP address.  Maybe you
  know more or have a friend that's skilled with that stuff."

- On November 17, at 11:28 AM, Mandarakas asked the same individual, "Do
  you know how to track the phone?"  When the person said that they would
  try, Mandarakas suggested a call, and they spoke later that night (at 10:33
  PM).  In the morning of November 19 (at 9:20 AM), Mandarakas wrote to
  the individual, "Any luck with the tracker?," to which the individual
  responded, "Not yet. but I'm working on it."  In the morning of November
  21, the individual wrote to Mandarakas, "Hey George, I hope this message
  finds you well! I utilized Kali Linux, and OS designed for ethical hackers

and hackers.  Despite trying various methods and tools, I'm not confident that I could successfully accomplish this.  It demands a high level of hacking skills.  My sincere apologies, man!" A few minutes later, Mandarakas responded, "No worries! Thanks for giving it a shot l."

- On November 16, 17, and 19, Mandarakas logged on and performed activities on Grabify IP Logger & URL Shortener, a website that one can use to track the location of another person by sending links and have the other person click on the link.  *See* https://grabify.link/ (last accessed Apr. 13, 2024).

- On November 18 at around 4:50 PM and 10:20 PM, Mandarakas searched "intentionally running into ex girlfriend."

- On November 25, at 6:47 PM, Mandarakas searched "how do ships refuel transatlantic," and "how do ships refuel at sea."

- On November 27, at around 8:50 AM, Mandarakas searched "ex girlfriend threatening to call police" and "ex girlfriend threatens."

- On November 27, at approximately 1:20 PM, Mandarakas searched for "countries not in interpol" and "Non extradition countries"

- On November 27, at around 3:50 PM, Mandarakas searched "how to install spywear that cant be removed for factory reset", "how to install spywear that can't be deove [sic.]," "installing spyware on macbook," "installing

8

spywear," and "can you install recording device in laptop."  [Notably, in December, Mandarakas sent the victim a MacBook computer.]

- On November 29, at 9:11 AM and 9:16 AM, Mandarakas searched for "tile tracker slowing" and "tile tracker slowing down."

- On December 4, between 7:35 PM to 7:40 PM, Mandarakas searched for "murder penalty spain," "murder penalty monetengro," "murder penalty albania," "murder penalty uk," "murder penalty ireland," "murder penalty croatia," "murder penalty france," "punishment for murder in greece," "how many years for murder in italy."  He also looked up "rape penalty spain."

- On December 5, at 9:23 AM, Mandarakas searched "josh tullis notre dame."

- On December 14, at 9:07 AM, Mandarakas searched "is it ok to sext an ex girlfriend" and "is it ok to sext an ex girlfriend who dumped you."

- On December 17, at 8:30 AM, Mandarakas messaged the individual whom he had asked to how to hack a phone on WhatsApp, "How can I get a location on someones [sic.] phone? Can you send a click bait link".  Later that day, at 1:24 PM, Mandarakas searched "fake passport" and "real passprt for sale."  Then, he also texted another individual, "I'm in need of a few things and wanted to see if you could refer me to your manager or someone

in your network.  These things aren't related to your services."[6]  When

asked what he wanted, Mandarakas responded, at 1:27 PM, "Drugs and a

passport with alt identity."  After the individual responded that they were not

interested, Mandarakas proceeded to ask them, at 2:51 PM, if they "know

any cyber experts."

- On December 19, at 12:24 AM, Mandarakas searched Michigan's and other

  states' laws concerning aggravated harassment.  Later that day, in the

  afternoon and evening, he searched for hotels and rental cars, and booked a

  hotel stay in Trenton, Michigan.

- On December 20, at approximately 7:15 AM, Mandarakas searched for

  "Stealth Private Investigations," "private investigators Detroit," and "can

  you hire a pi to follow anyone."

- On December 23 afternoon and evening, Mandarakas communicated with

  people on WhatsApp to procure their services to hack the victim's social

  media accounts.

---

[6] A note about this individual and their services provided to Mandarakas.  On the day before
(December 16), Mandarakas traveled to Michigan and met with this individual in a hotel in
Southfield, Michigan, for services that cost "500/hr incall," "$800/hr and Uber outcall," and
"350 hh [believed to be 'happy hour']".  When asked, Mandarakas told the individual his name
was "Mike," and that he was not affiliated with any law enforcement.  It is reasonable to infer
that the legality of the services this individual provided to Mandarakas was, at minimum,
dubious.

- On December 24, at around 9:00 AM, Mandarakas searched "spy recording devices," "spy recording devices with transmitter," and "spy recorder with radio transmission." He also shopped for magnetic voice activated recorder.

### C. Prior report of stalking

On March 8, 2024, law enforcement received information from another victim of Mandarakas's stalking and threatening behavior, who had heard about the instant case on the news. According to this victim, after she broke off her relationship with Mandarakas, Mandarakas excessively called and messaged her, despite her repeated attempts to cut off communications with him. The situation escalated when Mandarakas showed up unannounced at this victim's apartment and refused to leave. Mandarakas's stalking also involved death threats to this victim's new boyfriend. (Ex. 4 (filed under seal).)

## II. Procedural History

On December 18, 2023, Mandarakas was arrested and charged in a federal complaint with attempted kidnapping, in violation of 18 U.S.C. § 1201(a). Pretrial Services recommended pretrial detention. On January 10, 2024, Magistrate Judge Kimberly G. Altman ordered Mandarakas detained, based on both the risk of danger to the safety of any other person and the community and the risk of nonappearance. The magistrate judge thoroughly outlined her reasons for

11

detaining Mandarakas on the record. (ECF No. 19, PageID.78-83).  She also

followed up with a written order, summarizing her findings as follows:

> Defendant's actions show a level of deceit, dangerousness, and
> increasingly erratic behavior.  Evidence was presented that Defendant
> had plans to kidnap the victim and flee the country which shows his
> risk of non-appearance and the danger he poses to the victim, as well
> as to himself.  Defendant simply cannot be trusted to abide by any
> conditions of bond.  Pretrial also recommended detention.  Detention
> is warranted.

(ECF No. 12, PageID.23.)

Three months later, Mandarakas filed the instant motion asking the Court to

revoke the magistrate judge's order of detention. (ECF No. 25.)

## ARGUMENT

### I.    Pretrial Detention Eligibility

Mandarakas is eligible for detention on three grounds.  First, the offenses at

issue "involve[] the possession or use of a firearm."  18 U.S.C. § 3142(f)(1)(E).

Additionally, contrary to Mandarakas's contention, attempted kidnapping is a

crime of violence for the purpose of the Bail Reform Act.  18 U.S.C. §

3142(f)(1)(A).  Finally, this is a case that involves "a serious risk that [the

defendant] will flee."  18 U.S.C. § 3142(f)(2)(A).

####    A.    Mandarakas's offenses involved firearm possession.

Under § 3142(f)(1)(E), the government is entitled to a detention hearing in

cases that involve "any felony that is not otherwise a crime of violence that

involves... the possession or use of a firearm or destructive device." The statute's plain language does not require that the defendant be charged with possession of a firearm or with a crime that has a firearm possession element; rather, the offense must only *involve* the possession of a firearm. *See United States v. Hunter*, Case No. 22-mj-30177, ECF No. 31, PageID.108–12 (E.D. Mich. May 23, 2022) (Davis, M.J.) (the government was entitled to a detention hearing because law enforcement discovered a firearm during the conspiracy to commit murder for hire); *United States v. Clark*, Case No. 22-cr-20041, ECF No. 26, PageID.96 (E.D. Mich. April 5, 2022) (Hood, J.) (the government was entitled to a detention hearing because the defendant, who was charged with felon in possession of ammunition, clearly possessed a firearm at the same time he possessed the ammunition for which he was charged); *United States v. Watkins*, 940 F.3d 152, 166 (2d Cir. 2019) (holding that the government was entitled to a detention hearing because the defendant's possession-of-ammunition charge involved the use of a firearm).

Irrefutably, Mandarakas's offense involved the possession of the firearm. The complaint specifies that Mandarakas possessed a gun during his attempt to kidnap the victim. Mandarakas stored it in the same car where law enforcement found the body bag, the stun gun, the handcuffs, the zip ties, the field dressing gloves, the rope, the tape, and the ammunition. (ECF No. 1, PageID.9, ¶ 13.) Mandarakas does not deny that he possessed that firearm. (ECF No. 25,

PageID.119.)  Accordingly, the involvement of firearm in the offense is established

beyond a preponderance of the evidence, and the government is also entitled to a

detention hearing under § 3142(f)(1)(E). *Watkins,* 940 F.3d, at 165.

> **B.    Attempted kidnapping is a crime of violence under the Bail Reform Act.**

Additionally, Mandarakas is eligible to pretrial detention because attempted

kidnapping is a crime of violence under the Bail Reform Act.  Section 3156(a)(4)

defines the term "crime of violence" under the Bail Reform Act to mean:

> (A)    an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the property or property of another;

> (B)    any other offense that is a felony and that, by its nature, involves a substantial risk of physical force against the person or property of another that may be used in the course of committing the offense; or

> (C)    any felony under chapter 77, 109A, 110, or 118

18 U.S.C. § 3156(a)(4).

Section 3156(a)(4)(B), the so called "residual clause" of the definition, is

broad.  To fit the definition, there must only be a "substantial risk that physical

force against the person or property of another *may* be used in the course of

committing the offense." (emphasis added).  Attempted kidnapping involves a

substantial risk that physical force may be used against another person and is

therefore a crime of violence within the meaning of the Bail Reform Act.

Mandarakas's reliance on *United States v. Taylor*, 596 U.S. 845 (2022) is misplaced.  In *Taylor,* the Supreme Court held that attempted Hobbs Act robbery does not qualify as a crime of violence under the element clause of 18 U.S.C. § 924(c)(3). *Id.* at 848.  Here, neither the law (§ 924(c)) nor the test (under the elements clause) in *Taylor* is at issue.  Likewise, *United States v. Bustos,* No. 1:08-CR-297-LJO-3, 2016 WL 6821853 (E.D. Cal. Nov. 17, 2016) is inapposite.

Mandarakas's analysis ignores the applicability of § 3156(a)(4)'s residual clause. (ECF No. 25, PageID.107–09.)[7]  Attempted kidnapping crimes involve a substantial risk that physical force may be used against the victim.  As the Sixth Circuit reasoned in *United States v. Kaplansky*, 42 F.3d 320 (6th Cir. 1994), in

---

[7] In a much different context, the Supreme Court has struck down residual clauses in certain statutes that define the parameters of a crime of violence, including § 924(c)(3) that was at issue in *Taylor*.  *See e.g., United States v. Davis*, 139 S. Ct. 2319 (2019) (addressing the residual clause in 18 U.S.C. § 924(c)(3)(B)); *Johnson v. United States*, 576 U.S. 591 (2015) (addressing the residual clause of the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(2)(B)(ii)).  However, those cases do not control here.  They involve the "void-for-vagueness doctrine," which prohibits the enforcement of vague laws.  *Id.* at 2323.  Such a concern is not implicated here when § 3142(f)(1)'s "crime of violence" clause only applies to a procedural issue—whether a detention hearing should be held.  *See Beckles v. United States*, 137 S. Ct. 886, 894 (2017) (upholding the residual clause in the former version of USSG § 4B1.2(a)(2), because the concerns with "arbitrary enforcement" were not implicated).  As observed by one federal court of appeals, in upholding the residual clause of § 3142(f)(1): "[B]ecause § 3142(f)(1) does not define criminal offenses, fix penalties, or implicate the dual concerns underlying the void-for-vagueness doctrine [(fair notice and preventing arbitrary enforcement)], it is not amenable to a due process challenge and is therefore not unconstitutionally vague." *United States v. Watkins,* 940 F.3d 152, 160 (2d Cir. 2019).

holding that attempted kidnapping under Ohio law was a crime of violence under the residual clause of the ACCA[8]:

> …the essence of kidnapping is requiring another to do something against his or her will; and because physical force or restraint is usually the best way to overbear the will of another, physical force or threat of force is a latent, but more often actual, companion of the coercive element.  That deception may be used to effect the kidnapping does not erase the ever-present possibility that the victim may figure out what's really going on and decide to resist, in turn requiring the perpetrator to resort to actual physical restraint if he is to carry out the criminal plan.  Thus, the potential for violence against the victim is an inherent aspect of the crime of kidnapping…

*Id.* at 324.  With the same rationale, attempted kidnapping in violation of § 1201(a) "is a felony and that, by its nature, involves a substantial risk of physical force against the person or property of another that may be used in the course of committing the offense" as contemplated by 18 U.S.C. § 3156(a)(4)(B).

Because Mandarakas is charged with attempted kidnapping, his offense "involves a crime of violence" and the government is entitled to a detention hearing under § 3142(f)(1)(A).

## C.  There is a serious risk that Mandarakas will flee.

Mandarakas posed a serious flight risk, and pretrial detention is also available under § 3142(f)(2)(A).  Mandarakas prepared a checklist of what he

---

[8] The residual clause in 18 U.S.C. § 924(e)(2)(B)(ii)—"or otherwise involves conduct that presents a serious potential risk of physical injury to another"—was invalidated by *Johnson,* 576 U.S., at 606.  However, *Kaplansky*'s reasoning as to whether attempted kidnapping involves a substantial risk of physical force against another person remains persuasive.

would need while "on the run"—food, water, antibiotic supplies, "multiple burner phones", "cash only," "global currency", "fake passport/ID", and "change[d] legal name".  Mandarakas's intent to flee to another jurisdiction is evident by him putting overseas destinations on that list, as well as the boat ads and the sailing maps to countries that have no extradition treaty with the United States.  Indeed, Mandarakas searched the internet for "countries not in interpol" and "non extradition countries."  Mandaraks also looked up penalties for murder and rape in foreign jurisdictions.

Mandarakas fixates on arguing, as he did at the detention hearing, that it would be impossible for him to sail to foreign countries because he did not own a boat and does not know how to sail (ECF No. 25, PaegID.111.)  Not only does this contradict the victim's personal knowledge, but it is also incredible considering what Mandarakas had with him—a list that included "sailboat in cash" and traveling "across [the] Atlantic" without needing to refuel what-Mandarakas-referred-to-as "my yacht," accompanied by the sailing maps and the boat advertisements.  And perhaps Mandarakas did not own a boat *yet*, he did have a lot of cash with him and had included "cash only" and "sailboat in cash" as items on his "on the run" list.

## II.      Section 3142(g) Factors Support Pretrial Detention.

### A.      The nature and circumstances of the offense

There can be no dispute that the crimes at issue are serious, favoring

detention.  As explained above by the Sixth Circuit in *Kaplansky*, attempted

kidnapping involves a substantial risk of physical harm against the victim.

*Kaplansky*, 42 F.3d, at 324.  The offense also carries a severe punishment of up to

20 years' imprisonment, which reflects Congress's substantive judgment as to the

seriousness of this offense.  18 U.S.C. § 1201(d).

Mandarakas is also charged with stalking, another incredibly serious offense.

As proclaimed by President Barack Obama:

> [Stalking] is unacceptable behavior that violates the most basic
> principles of respect and decency, infringing on our fundamental right
> to feel safe and secure.  At some point in their lives, 1 in 6 American
> women will be stalked.  This abuse creates distress and takes a
> profound toll on its victims and our communities….  Stalking is a
> serious offense with significant consequences.  It is often detrimental
> to the physical and emotional well-being of the victim, and some are
> forced to move or change jobs.  This behavior often escalates over
> time, and is sometimes followed by sexual assault or homicide.

The White House-President Barack Obama, *Presidential Proclamation–National*

*Stalking Awareness Month, 2015* (Dec. 31, 2014).  Here, Mandarakas' stalking

behaviors were perilous. They have traumatized the victim and her family.  They

also did escalate over time, to the point that Mandarakas felt the need to look up

the murder and rape penalties in foreign countries.

The circumstances of the offense further favor detention.  Mandarakas's conduct involved pathological deception and an irrepressible obsession with the victim.  He lied to the victim about fundamental things like his age, his job, and his family status.  He was able to perpetuate his deception and manipulation for years.  So, contrary to Mandarakas's assertion, one can "date someone for four and a half years without getting to know them" (ECF No. 25, PageID.114), when that someone is exceptionally skilled at deception and manipulation.

Further, even after the victim had found out the truth about him, Mandarakas's deception did not stop.  Instead, he spewed more lies to try to get her back.  There is no truth in him.

The facts also show that Mandarakas was obsessed with the victim, and he was not able to curb his obsession.  He was told many times by others—the victim, her family, her friends, and his own friend—to stop stalking and harassing the victim.  He did not quit.  Quite the opposite, Mandarakas's efforts to hack, track, and harass the victim continued and were even intensifying.  It was not enough that Mandarakas placed a tracker on the victim's car; Mandarakas researched tracking her phone, hacking her accounts, and intentionally running into her, then sought out nefarious people to further stalk and harass her.

Mandarakas knew that he was committing serious crimes.  At one point, he looked up criminal aggravated harassment laws, but instead of putting an end to his

conduct, he thumbed his nose at the justice system and proceeded to plan his travel to Michigan to engage in more criminal behaviors.  Mandarakas apparently could not stop himself.

Mandarakas's continuous attempt to hack, track, and stalk the victim escalated to attempting to kidnap her.  When all else had failed, Mandarakas told his friend about kidnapping the victim to make the relationship work. Mandarakas's lunacy was so concerning that this friend, despite not knowing the victim, felt the need to find her and warn her.

Obviously, Mandarakas wants the Court to forget the items that he brought with him for hundreds of miles, across many states, over many hours, to where the victim was: the body bag, the rope, the knife, the zip ties, the handcuffs, the stun gun, the sex products, the gun, and hundreds rounds of ammunition.  They are archetypal kidnapper's supplies.  There is no reasonable or legitimate alternative explanation for why Mandarakas had these items or chose to take them with him to a place where he had no connection except the victim.  Mandarakas planned to kidnap and potentially kill the victim.

Mandarakas tries to undermine the severity of his offenses by arguing the merits of his attempted kidnapping charge. (ECF No. 25, PageID.116–17.)  At this juncture, it is not the Court's role to determine the merit of the case.  Regardless, Mandarakas took substantial steps to toward kidnapping when he tracked the

victim, stalked her, and travelled hundreds of miles with his kidnapping kit.  *See e.g., United States v. Jackson*, 560 F.2d 112, 120 (2d Cir. 1977) (the defendants were found to engaged in substantial step toward bank robbery when they "reconnoitered the place contemplated for the commission of the crime and possessed the paraphernalia to be employed in the commission of the crime").  If Mandarakas's defense is that he was just trying to talk the victim into leaving with him (ECF No. 25, PageID.116), as Mandarakas himself recognizes, attempted kidnapping can be committed by "inveigling or decoying" (*id.*, PageID.108.)  In any case, had the victim resisted, Mandarakas had the means to hold her, dead or alive.

Finally, as indicated above, Mandarakas had planned to flee.  He had a specific plan to be "on the run," with "fake ID/passport," "global currency," "change[d] legal name," and "multiple burner phones", on a "sailboat in cash" travelling "across [the] Atlantic" using mapped routes to Cuba or Morocco, two countries with whom the United States has no extradition.

The nature and circumstances of the charged offenses demand Mandarakas's continued pretrial detention.

### B.   Weight of the evidence

The second factor concerns the "weight of the evidence against the person." 18 U.S.C. § 3142(g)(2).  "This factor goes to the weight of the evidence of an

accused's dangerousness or flight risk, not to the weight of the evidence pointing to his or her guilt." *United States v. Stone,* 608 F.3d 939, 948 (6th Cir. 2010). Mandarakas's unyielding deception, his uncontrollable obsession with the victim, and his incomprehensible actions—driving hundreds of miles to hack, track, harass, and kidnap the victim, with body bag, rope, knife, zip ties, handcuffs, and weapon—are substantial evidence of dangerousness. Additionally, as explained above, the evidence of Mandarakas's nonappearance risk is also weighty given his detailed and thought-out plan to be "on the run."

This weight of evidence favors pretrial detention.

**C.    History and characteristics of the defendant**

As it did at the detention hearing, the government acknowledges that Mandarakas has no prior felony conviction. (ECF No. 19, PageID.59.) Contrary to Mandarakas's assertion (ECF No. 25, PageID.112), this fact also did not escape the magistrate judge. (*Id*, PageID.81.) However, what transcends Mandarakas's lack of criminal record are his history and the conduct at issue, which are far more telling of who he is. He is obsessive and compulsive yet calculated. He cannot be trusted, either in his representation to the Court or his ability to follow its conditions. Monitoring an individual with such traits in this district would already be very challenging. Such a task would be insurmountable in this instance, when Mandarakas has no ties to Michigan, his intended pre-trial location is distant, and

the proposed guardian (Mandarakas's mother) was seemingly complicit in,[9] or at least powerless to dissuade him from, his scheme to deceive the victim for years.[10]

A recent event also sheds more light on Mandarakas's problematic history and characteristics. Unprompted, a past victim of Mandarakas's disturbing and threatening behaviors reached out to law enforcement to inform them of what Mandarakas had done to her. This unsolicited report shows a pattern. Not only does it highlight the severity of Mandarakas's offenses, but it also shows the continuing nature of Mandarakas's troubling mindset and behaviors, and the palpable dangers he poses to the women he dated and the community.

Mandarakas's history and characteristics support pretrial detention.

### D.    Danger to others and the community

The circumstances and the facts presented—Mandarakas's characteristics, history, and conduct—illuminate the dangers Mandarakas poses to others and the community. He cannot be trusted. He is unhinged. Just as no one could understand why Mandarakas did what he did, no one can reasonably be assured of what he would do if released. As one court has observed, "[H]istory is replete with tragic stories of individuals being released on bond and immediately fulfilling threats of violence against the ex-spouses, family members, or partners the

---

[9] Mandarakas's mother met the victim several times during the relationship, but never told the victim about Mandarakas's wife and child.

[10] Mandarakas also lived with his mother when he engaged in the offenses at issue.

individuals had stalked, intimidated, and harassed." *United States v. Grooms,* No. 3:15-MJ-00025, 2015 WL 1982097, at *4 (S.D.W. Va. Apr. 29, 2015).

Accordingly, this factor weighs against release.

## CONCLUSION

Magistrate Judge Altman prudently ordered Mandarakas detained pending trial.  Clear and convincing evidence shows that no conditions or combination of conditions will reasonably assure the safety to others and the community, and preponderance of evidence supports that no condition or combination of conditions will reasonably assure Mandarakas's appearance as required.  The Court should uphold the magistrate judge's order and deny Mandarakas's motion.

Respectfully submitted,

DAWN N. ISON
United States Attorney

*/s/ Nhan Ho*
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, Michigan 48226
313-226-9632
Nhan.ho@usdoj.gov

Date:  April 24, 2024

**Certificate of Service**

I certify that on April 24, 2024, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Michigan using the ECF system, which will send notification of the filing to all users of record.

*/s/ Nhan Ho*
Assistant United States Attorney