UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 24-cr-20024
Honorable Linda V. Parker

GEORGE MANDARAKAS,

Defendant.
_______________________________/

**OMNIBUS OPINION AND ORDER DENYING DEFENDANT'S (1) MOTION TO TRANSFER VENUE; (2) MOTIONS TO SUPPRESS; (3) MOTIONS FOR PRETRIAL RELEASE; (4) MOTIONS TO DISMISS; AND (5) MOTION FOR RETURN OF PROPERTY**

Defendant George Mandarakas is charged in a two-count indictment for: (1) attempted kidnapping, in violation of 18 U.S.C. § 1201(a), (d); and (2) stalking, in violation of 18 U.S.C. § 2261A(1)(B). (ECF No. 13.) On January 10, 2024, Magistrate Judge Kimberly G. Altman ordered Defendant detained pending trial. (ECF No. 12.) Since his detention, Defendant Mandarakas has filed more than fifty pretrial motions.[1] The Court issues this omnibus opinion and order to resolve

[1] The Court imposed filing restrictions which require Defendant to consult with standby counsel and obtain Court authorization before filing new motions. The Court put Defendant on notice and announced the restrictions during a status conference held on February 9, 2026. (*See* ECF No. 158, PageID.1057-58.) Despite this instruction, Defendant filed fourteen unauthorized motions in the weeks following the conference. The Court struck the motions and issued an order restating the filing restrictions. (ECF No. 171.)

eighteen pending motions, including Defendant's motion to transfer venue (ECF No. 83); motions to suppress (ECF Nos. 84, 91, 112); motions for pretrial release (ECF Nos. 80, 94, 97, 109, 120, 122, 124, 133, 137); motions to dismiss (ECF Nos. 102, 104, 130, 134); and motion for return of property (ECF No. 135). All motions have been fully briefed. (*See* ECF Nos. 159, 167.)

The Court finds that a hearing will not aid in the resolution of the motions. Therefore, it is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f). For the reasons stated below, the Court denies Defendant's motions.

## BACKGROUND

Defendant was arrested on December 25, 2023, at St. Joseph's Catholic Church in Trenton, Michigan. (ECF No. 1, PageID.7-8.) The affidavit in support of the federal criminal complaint alleges that Defendant engaged in stalking behavior toward his former girlfriend, referred to as Adult Victim-1 ("AV-1"), by, among other things, placing a tracking device on her vehicle and driving from his home in New Jersey to Michigan, despite AV-1's request to end all contact with him. *Id.*

Defendant Mandarakas is married and has a child. (ECF No. 25, PageID.118.) Around 2019, he accepted a position at a university in the State of Indiana, where he met AV-1. (*Id.*; ECF No. 29 at PageID.132.) Defendant did not

inform AV-1, then 22 years old, that he was a university employee who was ten years older than her and married. Instead, he told AV-1 that he was a single, 22-year-old student at the university. (ECF No. 29, PageID.132.) Soon after, Defendant and AV-1 began a dating relationship that lasted four and a half years. *Id.* In September 2023, however, AV-1 learned the truth about Defendant and sought to end the relationship. *Id.*

On or about October 1, 2023, Defendant Mandarakas drove from his home in New Jersey and stayed at a hotel in Trenton, Michigan. (ECF No. 1, PageID.3.) During his stay, he sent numerous text messages to AV-1 and attempted to call her multiple times. AV-1 ultimately agreed to meet him at a park, where she again expressed her desire to cut all contact with Defendant. (ECF No. 1, PageID.4.) In response, Defendant allegedly attempted to block AV-1's exit, and when she pushed past and drove away, he ran after her vehicle. *Id.*

Even after this encounter, Defendant Mandarakas continued his efforts to contact AV-1. On November 20, 2023, Defendant appeared, unannounced, at AV-1's home in Trenton, Michigan. (ECF No. 19, PageID.52.) AV-1's mother answered the door and told Defendant to leave. *Id.* On November 22, 2023, Defendant approached AV-1 as she exited a salon in Woodhaven, Michigan. (ECF No. 1, PageID.4.) Defendant attempted to hug and kiss AV-1 and wedged his body between her driver's side door so that she could not close it. *Id.* Defendant

then pulled out a diamond ring and attempted to propose to AV-1 before she drove away. *Id.* Later that day, AV-1 went to a tavern with friends and noticed Defendant standing at the back entrance. (*Id.* at PageID.5.) She told Defendant to leave, which he did, but he returned shortly after in a different set of clothes. *Id.* AV-1 and her friends left the tavern.

On December 1, 2023, AV-1 allegedly received a message from Defendant's wife expressing concern for Defendant's mental health and sharing that he recently purchased a gun. (ECF No. 19, PageID.53.) Later that month, Defendant sent AV-1 a laptop, clothing, and a Christmas card. *Id.* The card was postmarked from Trenton, Michigan. *Id.*

On or about December 24, 2023, a friend of Defendant ("B.V.") called AV-1 and shared that he was concerned that Defendant Mandarakas was going to hurt or kidnap her. (ECF No. 29, PageID.132-33.) B.V. reported that Defendant repeatedly mentioned a podcast episode where a man kidnapped his girlfriend and took her to Mexico, and that the relationship worked out in the end. (*Id.* at PageID.133.) Upon receiving the warning from B.V., AV-1 searched her vehicle and discovered a tracking device taped to the bumper of her car. (*Id.* at PageID.132; ECF No. 85-1, PageID.494.)

On December 25, 2025, AV-1's father ("W2") and uncle ("W3") intentionally drove AV-1's tracked vehicle to St. Joseph's church to see if

Defendant Mandarakas would appear. According to the incident report, Mandarakas appeared shortly after W2 and W3 parked the car and was observed driving a Black Kia Forte bearing a Florida license plate. (ECF No. 85-3, PageID.502.) Mandarakas then circled the lot twice, parked down the street, and entered the Church. *Id.* After approximately 20 minutes of being in the Church, W2 observed Mandarakas exit and check to see if AV-1's vehicle was still parked.

AV-1 and her family called the police. The Trenton Police Department dispatched officers to the area. (ECF No. 85-1, PageID.495.) The officers detained, questioned, and ultimately arrested Mandarakas. During questioning, they learned that Mandarakas drove his own car, a Hyundai Elantra, from New Jersey to a rental car establishment in Woodhaven, Michigan, where he rented a Kia Forte and drove to the church in Trenton, Michigan. (*Id.* at PageID.7-9.)

Law enforcement recovered several items from both vehicles. In the rental vehicle, which was searched after his arrest, law enforcement found: approximately $12,000 in US and Canadian currency; multiple cellphones; a GPS magnetic tracking device; documents indicating the distance required to sail from New Jersey to Morocco and from Florida to Cuba; two advertisements for sail boats priced at $19,900 and $20,500; and a checklist.[2]

[2] The list outlined tasks such as purchasing a sailboat in cash, changing his name to Josh Tullis, and not activating a burner phone until he was "already on the run" and left the other behind. The

In Defendant's Hyundai Elantra, which was searched on December 26, 2023, pursuant to a search warrant, law enforcement found: a firearm; ammunition; handcuffs; rope; a stun gun; a field dressing kit containing a headlamp, a knife, bags of zip-ties, rope and field dressing gloves; a body bag with the shipping tag addressed to his New Jersey residence; a map of South America; black tape; and three large Ziploc bags containing sex toys, sex products, and ovulation predictors. (ECF No. 29-1.)

On December 29, 2023, Defendant made his initial appearance before Magistrate Judge David R. Grand. (ECF No. 4.) On January 10, 2024, Defendant appeared before Magistrate Judge Altman for a detention hearing. (ECF Nos. 10, 11.) At the hearing, Judge Altman considered new facts and circumstances not contained in the affidavit in support of the complaint. (*See* ECF No. 29)

For example, the Government presented evidence where the Federal Bureau of Investigation (FBI), pursuant to a search warrant, reviewed the contents of Defendant's personal cellular device. (ECF No. 29, PageID.136.) In October, Defendant made search inquiries related to placing a tracking device on a car, as well as "how to hack a mac." *Id.*

---

list also identified items to obtain, such as fake IDs/passports, global currency, "burner phones," scuba gear, a face mask, hair dye, and medical supplies. (ECF No. 29-2 at PageID.162.) The checklist also included a "Locations" section which read: (1) Med – safe weather pattern, safe currents, decks to EU + Turkey; (2) Cuba; and (3) SA. *Id.*

In November, Defendant made search inquiries on how to track a cellphone and communicated with an unnamed individual on WhatsApp who had experience with tracking phones. (*Id.* at PageID.137-38.) Defendant also made search inquiries related to installing spy wear or recording devices on laptops. (*Id.* at PageID.138-39) The FBI also revealed that Mandarakas made search inquiries on a shopping website for "body bags," and "body bags for dead bodies" (*Id.* at PageID.137); as well as search inquiries reading: "intentionally running into ex-girlfriend"; "ex-girlfriend threatening to call police"; and "ex-girlfriend threatens." (*Id.* at PageID.138.) He also searched "how do ships refuel transatlantic"; "how do ships refuel at sea"; "countries not in interpol"; "Nonextradition countries"; and "tile tracker slowing down." (*Id.*)

In December, Defendant messaged the previous unnamed individual, and others, for assistance with hacking. (*Id.* at PageID.139-40.) He then made search inquiries related to private investigators in Detroit and communicated with individuals for how to hack social media accounts. (*Id.* at PageID.140.) He also searched: "fake passport"; "real passport for sale"; and "josh tullis notre dame" during this period. (*Id.* at PageID.139.)

The FBI also reported that Mandarakas searched Michigan's and other states' laws related to aggravated harassment, as well as: "is it okay to sext an ex-girlfriend" and "is it ok to sext an ex-girlfriend who dumped you." (*Id.* at

PageID.139-40.) He also made search inquiries for the penalty for rape in Spain and the penalties for murder in the following countries: Spain, Montenegro, Albania, the United Kingdom, Ireland, Croatia, France, Italy, and Greece. (*Id.* at PageID.139.)

Since his ordered detention, Defendant Mandarakas has benefited from the assistance of five attorneys. On July 16, 2025, Mandarakas' then defense counsel informed the Court that Mandarakas wished to represent himself. Since then, Defendant Mandarakas has filed numerous pretrial motions, including a motion to transfer venue (ECF No. 83); three motions to suppress (ECF Nos. 84, 91, 112); nine motions for pretrial release (ECF Nos. 80, 94, 97, 109, 120, 122, 124, 133, 137); four motions to dismiss (ECF Nos. 102, 104, 130, 134); and one motion for return of property (ECF No. 135).

The Court addresses each motion category in turn.

## DISCUSSION

### I. Motion to Transfer Venue

On September 8, 2025, Defendant Mandarakas filed a motion to transfer venue under Federal Rules of Criminal Procedure 21(a) and 21(b). Specifically, he requests that this Court transfer the judicial proceedings to the District of New Jersey, due to (1) the Government's alleged failure to establish venue in the Eastern District of Michigan, (2) his belief that he would experience prejudice in

this district, and (3) for convenience. He also alleges that several federal employees and law enforcement officials have a bias against him, including various FBI agents, members of the Trenton Police department, and members of the Department of Justice.

The Government responds that venue is proper in the Eastern District of Michigan because it is the district in which Mandarakas completed several acts to support his stalking charge, and where he took a "substantial step" towards the commission of the alleged kidnapping. The Government also asserts that almost all of the underlying facts, events, and actions occurred in the Eastern District of Michigan, and that most of the evidence and many of the witnesses are present in this district. The Government also rejects Mandarakas' allegations of prejudice in this district. It notes that both the Supreme Court and the Sixth Circuit observe a high burden of proof for Defendants to overcome when they ask for transfer based upon a presumed prejudice theory.

For the reasons that follow, the Court denies Defendant Mandarakas' motion to transfer venue.

Article III, Section 2, Clause 3 of the United States Constitution provides the foundational venue requirements for federal criminal prosecutions:

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed[.]

U.S. Const. art. III, § 2, cl. 3.[3]

This brightline rule has been acknowledged and applied by the Sixth Circuit on several occasions. *See United States v. O'Donnell*, 510 F.2d 1190, 1192 (6th Cir. 1975) ("The basic venue requirements for federal criminal prosecutions are found in Article III, Section 2, Clause 3 and in the Sixth Amendment to the Constitution. The guarantee is for a trial in the state and district where the offense was committed."); *United States v. Wells*, 631 F. App'x 408, 414 (6th Cir. 2015) (citing Article III, Section 2, Clause 3 and noting that "the Constitution guarantees that a defendant shall be tried in the state and district in which the alleged offense was committed."); *see also United States v. Elliott*, 876 F.3d 855, 861 (6th Cir. 2017) (citing Article III, Section 2, Clause 3 of the United States Constitution as the first rule for its venue analysis).

Likewise, Rule 18 of the Federal Rules of Criminal Procedure provides that, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18. If the statute under which a defendant is charged does not provide a venue for the offense, "it becomes necessary to consult other sources to determine where the offense was committed." *O'Donnell*, 510 F.2d at 1192 (cleaned up).

---

[3] A similar rule is found in the Sixth Amendment: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI.

The Supreme Court has held that the "locus delicti" (or 'the place of the crime,') must be determined by, "initially identify[ing] the conduct constituting the offense (the nature of the crime) and then discern[ing] the location of the commission of the criminal acts." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999) (cleaned up); *see also Travis v. United States*, 364 U.S. 631, 635 (1961) (quoting *United States v. Anderson*, 328 U.S. 699, 703 (1946) (noting that "[w]here Congress is not explicit, the locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it.")

Because venue, in certain cases, may be appropriate in more than one district, long-standing precedent in this circuit applies the substantial contacts test to confirm that venue is constitutional in a given district. *United States v. Williams*, 788 F.2d 1213, 1215 (6th Cir. 1986). In applying this test, courts examine the "site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding." *Id.* So long as the contact is substantial, any one factor or combination of factors may be determinative. *See Elliott*, 876 F.3d at 862 (venue proper in district where harmful effects of a continuing offense were foreseeable to defendant); *United States v. Hagar*, 822 F. App'x 361, 371 (6th Cir. 2020) (venue proper in district where some evidence and the "locus of the effect" were found).

**A. Venue is Proper in the Eastern District of Michigan**

The Government must prove that venue is proper as to each count charged. *United States v. Wood*, 364 F.3d 704, 710 (6th Cir. 2004). Defendant Mandarakas is charged with one count of stalking (18 U.S.C. § 2261(A)) and one count of attempted kidnapping (18 U.S.C. § 1201).

**1. Stalking**

The federal stalking statute, 18 U.S.C. § 2261(A), provides the following:

Whoever —

(1) travels in interstate or foreign commerce . . . with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that—

(A) places that person in reasonable fear of the death of, or serious bodily injury to—

(i) that person . . . ; or

(B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i) . . . ; or

(2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—

(A) places that person in reasonable fear of the death of or serious bodily injury to a person[;] or

> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i) . . . of paragraph (1)(A),
>
> shall be punished[.]

Here, the record heavily supports a finding that venue is proper in this district as to Mandarakas' stalking charge. Although Mandarakas is correct that proper venue can exist in multiple districts, he is incorrect in asserting that the Government failed to establish venue in the Eastern District of Michigan. (ECF No. 83, PageID.469, 471.)

The record reveals that (1) Mandarakas traveled in interstate commerce on multiple occasions from his home in New Jersey to Michigan in an effort to contact the victim, ("AV-1"); (2) Defendant Mandarakas appeared, unannounced at AV-1's home in Trenton, Michigan; (3) Defendant appeared unannounced at a salon in Woodhaven, Michigan, and attempted to hug and kiss AV-1; (4) Defendant sent AV-1 a card postmarked from Trenton, Michigan; (5) AV-1 found a tracker on her car in this district; (6) Defendant purchased a rental car in Woodhaven, Michigan; and finally, (7) that Defendant, driving said rental car, appeared at Saint Joseph Catholic Church in Trenton, Michigan, after AV-1's family intentionally drove her tracked vehicle there. (ECF No. 1, PageID.4-5, 7; ECF No. 19, PageID.51-55; ECF No. 159, PageID.1171.) Importantly, all the

aforementioned events occurred after AV-1 told Defendant Mandarakas that she did not wish to have any further contact with him. (ECF No. 1 at PageID.4.)

Taken together, these facts demonstrate substantial contacts with this district, as the "site of the defendant's acts" and "the locus of the effect of the [alleged] criminal conduct" clearly occurred in the Eastern District of Michigan. The Government has also explained that much of the evidence and several witnesses are in this district, which supports a theory that this district is "suitable for accurate fact finding." Therefore, the Court rejects Mandarakas' challenge and finds that venue for his stalking charge is proper in the Eastern District of Michigan.

**2. Attempted Kidnapping**

The applicable kidnapping statute, 18 U.S.C. § 1201, provides,

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, abducts, or carries away and holds for ransom or reward or otherwise any person . . . when . . .
>
> (1) the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State boundary, or the offender travels in interstate . . . commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense . . .
>
> shall be punished by imprisonment[.]

Subsection (a) prohibits kidnapping in its completed form. Subsection (d) of that same section provides, "Whoever *attempts* to violate subsection (a) shall be punished by imprisonment for not more than twenty years." 18 U.S.C. § 1201(d) (emphasis added).

To convict a defendant of attempt, the government must prove (1) the defendant's intent to commit the criminal activity; and (2) that the defendant committed an overt act that constitutes a "substantial step" toward the commission of the crime. *United States v. Bilderbeck*, 163 F.3d 971, 975 (6th Cir.1999). A substantial step must consist of an overt act which objectively marks the defendant's conduct as criminal in nature. *Id.* However, an "overt act" must amount to more than "mere preparation." *United States v. Bailey*, 228 F.3d 637, 640 (6th Cir. 2000) (internal quotation marks and citation omitted); *see also United States v. Wilder*, 87 F.4th 816, 820 (6th Cir. 2023) (explaining that, for conduct to qualify as a substantial step, it must go beyond preliminary activities and mere preparation).

Mandarakas argues that his "substantial step" occurred in New Jersey, because the "Government alleges that the charged offenses began there." (ECF No. 83, PageID.470.) The Court is unable to discern the *specific* New Jersey conduct Mandarakas is referring to—be it alleged surveillance, planning activities, the purchase of particular items, or something else altogether. The closest the

Court can identify is the Government's statement that Mandarakas "drove from his home in New Jersey to Michigan" and that a tarp was found in his vehicle that included a shipping tag addressed to his New Jersey residence. (ECF No. 1, PageID.9; ECF No. 13, PageID.24.) In any event, these actions do not qualify as a "substantial step."

Defendant Mandarakas' argument has two fatal weaknesses. First, Mandarakas ignores the Sixth Circuit's reluctance to classify any and all activity that may bear some relation to a crime as a "substantial step." Ordering materials to one's home—located several states away from the victim—and initiating interstate travel align more closely with mere preparation than with a "substantial step."

Second, the Court is not convinced that a "substantial step" towards attempted kidnapping could occur in New Jersey because the applicable statute provides that an attempt to "hold" the victim is required. 18 U.S.C. § 1201(a). Initiating travel and ordering materials, despite their connection to the ultimate event, cannot be said to constitute a substantial step towards "holding" the victim when those actions took place several states away. Moreover, the statute references interstate travel only in relation to transporting *the victim*, not the defendant. Interstate travel only appears as a post-requisite to a defendant seizing, confining, abducting, or otherwise carrying a person away. *See* 18 U.S.C. §

1201(1). Therefore, Defendant Mandarakas' "substantial step" did not occur in the District of New Jersey. This finding is only strengthened when the two New Jersey actions are viewed in comparison to other facts in the record.

Defendant Mandarakas' "substantial step" toward attempted kidnapping occurred on December 25, 2023, in the Eastern District of Michigan.[4] On this day, AV-1's family drove her tracked vehicle to a church in Trenton, Michigan, to see if Mandarakas would appear. *Id.* Mandarakas arrived at the church shortly after and circled AV-1's vehicle twice. He then parked his car away from the property, walked into the church, and stayed inside for approximately twenty minutes. After Trenton Police were called to the church and arrested Mandarakas, a search of his rental car revealed that he possessed a large quantity of US and foreign currency, multiple cell phones, an additional tracking device, maps, a checklist including supply items and instructions such as "change name to Josh Tulls" [sic] and don't activate new phone until "on the run and left other phone behind." *Id*. at PageID.8-9. A subsequent search of his personal vehicle — which was parked at a Hertz Car Rental in this district — uncovered a firearm, ammunition, handcuffs, rope, a

[4] Again, for background, a friend of Mandarakas called the victim on December 24, 2023, and shared that he was concerned that Mandarakas was going to hurt or kidnap her and take her to Mexico. (ECF No. 1, PageID.6.) On that same day, AV-1 found a tracking device on her vehicle. *Id.* at PageID.7.

knife, a stun gun, a field dressing kit, and the tarp mentioned above. *Id.* at PageID.9.

In the Court's view, Mandarakas' actions on December 25, 2023, serve as his true "substantial step" towards kidnapping. As with the Court's venue analysis for his stalking charge, these facts demonstrate substantial contacts with this district because the "site of the defendant's acts" and "the locus of the effect of the [alleged] criminal conduct" occurred in the Eastern District of Michigan. Additionally, the evidence in the Defendant's two vehicles were recovered here, which supports a theory that this district is "suitable for accurate fact finding." Therefore, the Eastern District of Michigan serves as the proper venue for the attempted kidnapping charge.

Having established that the Eastern District of Michigan is a proper venue for trial, the Court will now proceed to determine whether the arguments within Defendant's motion for transfer have merit.

**B. Motion to Transfer Under Rule 21(a)**

Federal Rule of Criminal Procedure 21 governs venue transfers in federal court. Subsection (a) of the rule provides the following:

> (a) For Prejudice. Upon the defendant's motion, the court must transfer the proceeding against that defendant to another court if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there.

Fed. R. Crim. P. 21(a).

Defendant Mandarakas' motion to transfer under Rule 21(a) is based upon allegations of actual and presumed prejudice. The Court will address each in turn.

The Supreme Court has drawn a distinction between presumed and actual prejudice from pretrial publicity. *See Ritchie v. Rogers*, 313 F.3d 948, 952 (6th Cir. 2002) (citing *Murphy v. Florida*, 421 U.S. 794 (1975) (noting that there is clearly established Supreme Court precedent distinguishing between cases involving actual prejudice—when review of both the jury voir dire testimony and the extent and nature of the media coverage indicates "a fair trial is impossible" and presumed prejudice—when the "setting of the trial is inherently prejudicial.") (brackets removed) (cleaned up)).

**1. Actual Prejudice**

Voir dire is the "primary tool for discerning actual prejudice." *United States v. Poulsen*, 655 F.3d 492, 507 (6th Cir. 2011) (citing *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007)). Actual prejudice cannot be established by negative media coverage, prior knowledge of the issues involved in the case, or even "a juror's preconceived notion as to the guilt or innocence of the defendant" without something more to rebut the presumption of impartiality. *Poulsen*, 655 F.3d at 507-08 (citing *Foley*, 488 F.3d at 387)). Actual prejudice is established when "both the jury voir dire testimony and the extent and nature of the media coverage

indicates a fair trial [was] impossible." *Poulsen*, 655 F.3d at 507 (citing *Ritchie*, 313 F.3d 948, 952 (6th Cir.2002) (alteration in original) (internal quotation marks omitted)).

Defendant Mandarakas has failed to offer a showing of actual prejudice. In his brief, he alleges that several Trenton police officers have treated him unfairly and that the officers forged documents to have him arrested. He also advances unsubstantiated claims that members of the FBI and AUSA Nhan Ho "are not motivated by good faith," and that they coerced witnesses to testify against him to secure an indictment. He also alleges that "government officials contacted legacy media outlets [about the case] to prejudice" him, and that "the nature of the publicity has irreversibly contaminated the public's perception of the Defendant." (ECF No. 83, PageID.474.) Nowhere does Mandarakas offer evidence that he has experienced *actual* prejudice regarding his ability to have a fair trial in this district.

Defendant's motion, as it relates to actual prejudice, is premature. As previously mentioned, voir dire is the "primary tool for discerning actual prejudice" and a "review of jury voir dire testimony" is necessary to determine whether actual prejudice exists. The Court is unable to use this tool because the trial has not yet occurred. The Court fully expects that a jury of fair-minded citizens will be seated and will decide the case in a way that honors the rights of all

involved. If not, Defendant Mandarakas will have an opportunity to make a case for actual prejudice at that time.

The Court will proceed to evaluate whether presumed prejudice can be applied to this case.

**2. Presumed Prejudice**

The Supreme Court has held that a presumption of prejudice is only applied to an "extreme case," where the trial atmosphere would be "utterly corrupted by press coverage." *United States v. Skilling*, 561 U.S. 358, 380-81 (2010) (quoting *Murphy v. Florida*, 521 U.S. 794, 798 (1975)). In the Sixth Circuit, the phrase "inflammatory, circus-like atmosphere" is utilized to evaluate whether a Defendant's media publicity creates presumptive prejudice against his defense.

In evaluating presumed prejudice, the Supreme Court has considered several factors: (1) the size and characteristics of the community in which the crime occurred; (2) the nature and content of pretrial publicity; and (3) the passage of time between the publicity and the trial. *Skilling*, 561 U.S at 381-84.

Accordingly, the Court will apply the Supreme Court's three-part test to determine if the circumstances before it support Defendant's theory of presumed prejudice.

The size and characteristics of the community in which the crime occurred weigh against a finding of presumed prejudice. The Eastern District of Michigan

consists of 34 counties, and more than 6.5 million individuals reside in this district. Potential jurors in this district are drawn from urban, suburban and rural areas and are exposed to various news sources. Thus, the juror pool is sufficiently large to allow for a fair and impartial jury. *See Skilling*, 561 U.S. at 382 (finding that the "large, diverse pool of potential jurors" in Houston, Texas, reduced the likelihood of prejudice); *see also Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (finding that the potential for prejudice was mitigated by the size of the "metropolitan Washington [D.C.] statistical area, which has a population of over 3 million[.]")

Second, the nature and content of Defendant's pretrial publicity weigh against a finding of presumptive prejudice. When examining this factor, courts consider whether news reports contained a "confession or other blatantly prejudicial information." *Skilling*, 561 U.S. at 382. Here, Mandarakas has not made a confession, nor has he demonstrated that the news articles have reported blatantly prejudicial information. As in *United States v. Johnson*, much of the publicity in this case has been "primarily descriptive of the indictment[.]" 584 F.2d 148, 154 (6th Cir.1978). The existence of articles that simply report the facts of an alleged offense is insufficient to warrant a change of venue.

Likewise, the passage of time weighs against a finding of presumptive prejudice. Under this factor, the Court must consider whether "trial swiftly followed a widely reported crime." *Skilling*, 561 U.S. at 383. Mandarakas' trial is

scheduled to begin on October 27, 2026, almost three years from the date of his arrest on December 25, 2023. Additionally, almost all of the articles were published between December 2023 and January 2024. Thus, the length of time between the publicity and the trial weighs against a presumption of prejudice.

Therefore, after considering all of the *Skilling* factors,[5] the Court finds that presumed prejudice is inapplicable.

**C. Motion to Transfer Under Rule 21(b)**

The Court declines to transfer venue to the District of New Jersey for Mandarakas' personal convenience under Federal Rule of Criminal Procedure 21(b).

Rule 21(b) reads as follows:

> Upon the defendant's motion, the court *may* transfer the proceeding, or one or more counts, against that defendant to another district for the convenience of the parties, any victim, and the witnesses, and in the interest of justice.

Fed. R. Crim. P. 21(b) (emphasis added).

Language found within Rule 21(b) suggests that this decision is one of discretion, rather than obligation. The Sixth Circuit has reached the same conclusion. *See United States v. Jamal*, 246 F. App'x 351, 369 (6th Cir. 2007)

---

[5] As an aside, the *Skilling* Court noted that juror questionnaires and voir dire were "well suited" to carefully identify and inspect the impact of pretrial publicity on prospective jurors. *Skilling*, 561 U.S. at 384. The undersigned already observes this practice (written questionnaires) and may take other measures to prevent juror bias, such as individual questioning of prospective jurors at sidebar, if necessary.

("The criminal rules require that a transfer for convenience satisfy the convenience of both parties . . . [defendant] is simply incorrect that the criminal rule mandates a transfer for the parties' convenience. That decision is within the discretion of the district court, as indicated by the rule's use of the word 'may.'")

In any event, the Court is not persuaded that any convenience to Mandarakas or his family would outweigh the convenience of conducting a trial where key witnesses reside, key evidence was seized, and the underlying events occurred.

Therefore, the Court finds that:

(1) The Eastern District of Michigan is a proper venue for the crimes alleged;
(2) Defendant Mandarakas' prejudice arguments are insufficient to warrant transfer under Federal Rule of Criminal Procedure 21(a);
(3) Defendant Mandarakas' personal and family convenience do not warrant transfer under Federal Rule of Criminal Procedure 21(b).

Accordingly, Defendant's motion to transfer venue pursuant to Federal Rule of Criminal Procedure 21 (ECF No. 83) is **DENIED**.

## II. Motions to Suppress

On December 25, 2023, Defendant Mandarakas was detained and arrested outside of St. Joseph Catholic Church in Trenton, Michigan. Mandarakas now argues that the arrest was unlawful. He moves to suppress all evidence deriving from the December 25 encounter, including evidence retrieved from his rental car and personal vehicle.

Defendant Mandarakas filed three separate motions to suppress. (ECF No. 84; ECF No. 91; ECF No. 112.) The motions are fully briefed. (*See* ECF No. 159, PageID.1127-66; ECF No. 167, PageID.1293-1331.) Each motion addresses a separate portion of the December 25 encounter, but the motions include some overlapping facts and arguments. For organizational purposes, the Court will first address Defendant's motion to quash his arrest, then proceed to evaluate his search-related challenges.

**A. Motion to Quash Arrest**

In his first motion, Defendant Mandarakas moves to quash his December 25, 2023, arrest. (ECF No. 84). He argues that Trenton Police officers arrested him at the outset of the encounter without probable cause. *Id.* at 480, 483. Defendant Mandarakas and the Government agree that he was arrested at some point during the encounter. They disagree about when the arrest occurred and whether the arrest was lawful. (*Id.*; ECF No. 159, PageID.1128-37.)

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons … against unreasonable searches and seizures." U.S. Const. amend IV. The Fourth Amendment's protection against unreasonable seizures does not apply unless a person is actually "seized" and "[n]ot every police/citizen encounter constitutes a seizure." *United States v. Richardson*, 949 F.2d 851, 855 (6th Cir.1991). Courts recognize three types of encounters between police officers and

citizens: "consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or Terry stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause." *United States v. Campbell*, 486 F.3d 949, 953-54 (6th Cir. 2007) (citing *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir.1994) (quotation marks omitted). Consensual encounters do not implicate an individual's Fourth Amendment rights because the individual is not "seized" within the meaning of the Fourth Amendment. *Florida v. Royer*, 460 U.S. 491, 497 (1983). Once a seizure occurs, however, the Fourth Amendment's protections are implicated.

**1. Seizure**

As an initial matter, the Court must determine if and when a seizure occurred. In *Florida v. Bostick*, the Supreme Court noted that, in analyzing a potential seizure, "a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." 501 U.S. 429, 439 (1991). The Sixth Circuit has communicated this rule in its own language. *See Pennington v. Metro. Gov't of Nashville and Davidson County*, 511 F.3d 647, 651 (6th Cir.2008) (explaining that a person is seized when "a reasonable person would not feel free to leave an

encounter with police"); *see also United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004) (noting that a seizure occurs "when a reasonable person would not believe he or she was free to leave or disregard the officer's requests").

Circumstances indicative of a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *United States v. Jones*, 562 F.3d 768, 774 (6th Cir. 2009) (additional citations omitted). To constitute a seizure, the individual must actually surrender to the officer's show of authority. *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010)).

Here, Defendant Mandarakas was seized when Officer Bedsun exited his vehicle, ordered Mandarakas to show his hands, and Mandarakas complied. (ECF No. 84; PageID.480; ECF No. 85-3, PageID.502) A reasonable person facing these circumstances would not feel free to leave or disregard Officer Bedsun's requests. The Government does not dispute that Mandarakas complied with the order, which demonstrates that he surrendered to Officer Bedsun's display of authority. The Court finds these facts sufficient to establish a seizure, but to the extent that any uncertainty remains, Officer Bedson acknowledges that he detained Mandarakas in handcuffs shortly—if not immediately—after approaching him.

(ECF No. 83-3, PageID.502.) Therefore, Mandarakas was seized, and the Fourth Amendment protections attach.

**2. Investigatory "Terry" Stop or Arrest**

Having determined that Mandarakas was seized, the Court now turns to whether his detention amounted to an investigatory stop or an arrest. Defendant Mandarakas argues that the encounter was a de facto arrest because Officer Bedsun "shoved him against a wall" and placed him in handcuffs. This characterization is inconsistent with Sixth Circuit precedent and with the video footage documenting the encounter.

As explained in the Government's brief, the Sixth Circuit has repeatedly held that officers may use handcuffs during a Terry stop when "circumstances warrant that precaution." *Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008); *see also Houston v. Clark County Sheriff Deputy John Does*, 174 F.3d 809, 814-15 (6th Cir.1999) (acknowledging that precautionary handcuffing reasonably necessary for protection of officers does not exceed the bounds of a Terry stop); *United States v. Atchley*, 474 F.3d 840 (6th Cir. 2007) (handcuffing suspect during Terry stop was justified based on suspects nervous behavior and officer's past experience). Here, Trenton police officers were justified in using handcuffs to detain Mandarakas. In the moments leading up to his detention, Mandarakas exhibited nervous and evasive behavior, and officers were responding to a report

that he was stalking and attempting to kidnap his ex-girlfriend. Under these circumstances, handcuffing Mandarakas was reasonably necessary to assure the officers' safety.

To be clear, a Terry stop "may ripen to an arrest through the length of time[6] or the use of force." *Houston*, 174 F.3d at 814. But the video footage does not support Mandarakas' claim that he was shoved against a wall. (TRENT01_LL0001.) He alleges that this occurred at 11:02:54, yet he and Officer Bedsun first appear in the frame at 11:02:53. From that moment until 11:03:03, Mandarakas is shown standing with his feet several inches from the wall and no shoving is displayed. Mandarakas is then shown asking an officer, "why are you arresting me?" *Id.* at 11:03:08. The officer responds, "you're not—just detained, man, until we sort out what's going on." *Id.* at 11:03:09-12.

Neither the use of handcuffs nor the alleged force transformed this encounter into a de facto arrest.

**3. Reasonable Suspicion and Investigatory "Terry" Stop**

It is well-settled that police may make a warrantless investigatory stop based upon reasonable suspicion of an ongoing crime. *Terry v. Ohio*, 392 U.S. 1 (1968).

---

[6] Mandarakas does not argue that the duration of the stop converted the detention into a de facto arrest. Even if he had, the video shows that officers questioned him for approximately thirty minutes. That length of time is not so egregious as to transform the encounter into a de facto arrest, especially given that Mandarakas provided vague and circular answers which naturally extended the questioning.

"Reasonable suspicion requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a Terry stop." *Dorsey*, 517 F.3d at 395. Officers may also "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In determining the validity of a Terry stop, courts look at the totality of the circumstances. *United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002). Here, the Government identifies several facts supporting reasonable suspicion: (1) officers responded to a report from AV-1 and her family that Mandarakas was in the area and possibly attempting to kidnap her; (2) the tips were not anonymous, and Mandarakas was identified by name and description; (3) upon arrival, officers independently observed a man matching that description walking in the church alley; and (4) when approached, Mandarakas lowered his head, entered the church, and then exited through a different set of doors. (ECF No. 159, PageID.1130.)

Taken together, these events caused officers to suspect that Mandarakas may have been engaged in criminal activity. The officers did not act on a "mere

hunch." Rather, Mandarakas was stopped after exhibiting behavior consistent with nervousness and evasion, and after officer's confirmed that he matched the description provided in the dispatch. This is evidenced by an officer telling Mandarakas, "we've got a report on you," shortly after he is handcuffed. (TRENT01_LL0001, at 11:03:23.)

Moreover, the Sixth Circuit has recognized that reliable tips can justify a Terry stop. *United States v. Craig*, 306 F. App'x 256, 260 (6th Cir. 2009) ("It is well-settled that a tip from a reliable informant likewise may justify a Terry stop[.] Tips from identified citizens have a high indicium of reliability, in part because such witnesses risk adverse consequences for providing faulty information.") (citations omitted). The reports from AV-1 and her family, combined with the officers' observations and Mandarakas' evasive conduct, were sufficient to satisfy the reasonable suspicion standard. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.") (collecting cases).

Based on the totality of the circumstances, the Court finds that the officers possessed reasonable suspicion.

**4. The Arrest**

The parties agree that Defendant Mandarakas was arrested at some point during the encounter. Mandarakas argues that the arrest was not based on probable cause.

"An officer possesses probable cause when, at the moment the officer seeks the arrest, 'the facts and circumstances within the officer's knowledge and of which [he] had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense.'" *Wesley*, 779 F.3d at 429 (alterations omitted) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). The probable cause standard is a "practical, non-technical conception" guided by the "factual and practical considerations of everyday life." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S 213, 231(1983). Courts consider the totality of the circumstances to determine whether an officer had probable cause to make an arrest. *United States v. Tillman*, 404 F. App'x 949, 951 (6th Cir. 2010) (citing *Gates*, 462 U.S at 230).

Furthermore, the Supreme Court has held that the reason the officer gives for an arrest need not be the reason which actually provides probable cause for the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 153-55 (2004). If the facts known to the officers support probable cause in any form, then an individual may lawfully be arrested. *Id.* at 155; *see also United States v. Dunavan*, 485 F.2d 201, 205 (6th Cir.

1973) ("[T]he validity of an arrest is to be judged by whether the arresting officers actually had probable cause for the arrest rather than by whether the officers gave the arrested person the right reason."). In other words, when an officer makes an arrest that is properly supported by probable cause, "[t]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest." *Bailey v. Bd. of Cty. Comm'rs*, 956 F.2d 1112, 1119 n.4 (11th Cir. 1992) (citing *United States v. Saunders,* 476 F.2d 5, 7 (5th Cir.1973) (additional citations omitted).

Importantly, probable cause can "rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the arrest." *United States v. McManus*, 560 F.2d 747, 750 (6th Cir. 1977) (collecting cases); *see also Willis v. Neal*, 247 F. App'x 738, 742 (6th Cir. 2007) (citing *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir.1989) ("[I]t is well established that the arresting officer need not personally be aware of all of the facts amounting to probable cause and that probable cause can be established by the collective knowledge of the officers on the scene.")) (additional citations omitted).

An officer may conduct a warrantless arrest of an individual in a public space when the officer has probable cause to believe that the individual has (1) committed a felony or misdemeanor in the officer's presence or (2) committed a felony away from the officer's presence. *United States v. Watson*, 423 U.S. 411, 417-18 (1976). Defendant Mandarakas was booked under a misdemeanor assault

charge. (ECF No. 85-5, PageID.510.) Mandarakas argues that because the police records list "stalking" rather than assault as the charge, his arrest was invalid. (ECF No. 84, PageID.489) This difference is immaterial; an arrest supported by probable cause is valid regardless of the offense given at the time of the arrest. *See Devenpeck*, 543 U.S. at 153-55; *Dunavan*, 485 F.2d at 205.

Officer Bedsun arrested Mandarakas at approximately 11:31 AM. (*See* ECF No. 85-5, TRENT13_LL0013.) At that moment, Trenton police officers collectively possessed probable cause to arrest Defendant Mandarakas.

Officers had probable cause to arrest Mandarakas based on conduct they personally observed on December 25. As the Government explains:

> "when officers arrived at the scene, they observed Mandarakas . . . in the immediate vicinity of AV-1's church, on a day when her family had reported that he was there to find her, having followed a GPS tracker . . . on her vehicle to that precise location. The offense was not merely suspected; it was unfolding before the officers' eyes."

Even at the outset of Mandarakas' detention, he made statements that enabled officers to further develop probable cause. Video footage of his detention shows the following interaction:

Officer (11:03.48): What are you doing here?

Mandarakas (11:03.56): I don't have any weapons on me.

Officer (11:04.06): I mean, you're scaring a lot of people, brother.

Mandarakas (11:04.08): Yeah, I'm sorry.

> Officer (11:04.11): She doesn't want anything to do with you. That's pretty clear if you're stalking her, right?
>
> Mandarakas (11:04.17): Right.

(TRENT01_LL0001 at 11:03:48-11:04:20).

Officers also received information outside of Mandarakas to support probable cause. At some point during the Terry stop, Lieutenant Grignon, Sergeant Stadler, and Sergeant Driscoll left the other officers to interview AV-1's father ("W2") and uncle ("W3") near Mandarakas' rental vehicle.[7] (ECF No. 85-2, PageID.497; ECF No. 85-3, PageID.502.)

From this interview, they learned about the following events that occurred outside of their presence: (1) on or about December 20, 2023, AV-1 received a blank Christmas card bearing a Trenton, Michigan, postage stamp; (2) AV-1 told W2 that a friend of Mandarakas informed her that Mandarakas was possibly going to hurt or kidnap her; (3) W2 and W3 searched AV-1's vehicle for a possible tracking device and found one taped to the underside of her rear bumper; (4) W2 had the tracking device in his possession and provided it to Sergeant Driscoll; (5)

[7] W2 and W3's statements were sufficiently trustworthy to establish probable cause. "Probable cause is created only by eyewitness allegations that are 'reasonably trustworthy[.]'" *Wesley*, 779 F.3d at 429-30 (citing *Logsdon v. Harris*, 492 F.3d 334, 342 (6th Cir. 2007) (internal quotations omitted)); *see also Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (holding that firsthand observations are entitled to a presumption of reliability and veracity); *Tillman*, 404 F. App'x at 952 ("Unlike a tip from an anonymous informant . . . police corroboration is not necessary when the tip comes from a known reliable source who has personally observed criminal activity.").

on the morning of December 25, 2023, W2 and W3 drove AV-1's tracked vehicle to St. Joseph Church; (6) W2 and W3 watched Mandarakas arrive at the church and drive past AV-1's vehicle twice before parking one half block west of the church. *Id.*

Upon receiving this information, Lieutenant Grignon, Sergeant Stadler, and Sergeant Driscoll told Officer Bedsun to "arrest Defendant Mandarakas for stalking." (ECF No. 85-3, PageID.502; TRENT13_LL0013-001.)

Considering these facts—the officers' initial observations, Defendant's statements, W2 and W3's eyewitness allegations, and the physical tracker provided to Sergeant Driscoll —the Court finds that the officers collectively possessed probable cause to arrest Mandarakas. Therefore, his arrest was lawful.

Defendant's motion to quash his arrest (ECF No. 84) is **DENIED**.

**B. Motion to Suppress—Kia Forte**

In his second motion, Mandarakas seeks suppression of all evidence obtained during the search of his rental car. (ECF No. 91.) He argues that the evidence should be suppressed under the fruit of the poisonous tree doctrine, and that officers would not have been able to search his vehicle "without the illegal arrest and seizure of his car keys." (ECF No. 84; PageID.489; ECF No. 91, PageID.535.) The Court has already concluded that the arrest was lawful. Therefore, it will proceed to evaluate whether the officers were justified in taking

Mandarakas' keys and subsequently performing a warrantless search of his rental car.

**1. Officers Obtain Mandarakas' Car Keys**

Mandarakas claims that officers improperly removed car keys from his pocket while conducting a frisk during his Terry stop. (ECF No. 91, PageID.531.) He argues that officers could not have searched and retrieved evidence from his rental car ("Kia Forte") without taking the keys at that moment. This argument fails.

The Court has reviewed the video footage Mandarakas cites as evidence. (ECF No. 91, Exhibit 5 "110341TRENT13_LL00013"). The video shows an officer conducting a pat down and checking Mandarakas' pockets. But when the pat down is finished, the officer's hand is completely obscured by sunlight. (*See id.* at 11:03:25.) The cited footage therefore does little more than confirm that an officer performed a precautionary pat down and checked Mandarakas' pockets.

Even assuming that the keys were unlawfully removed, the keys would have been inevitably discovered. Under the inevitable discovery doctrine—an exception to the "fruit of the poisonous tree" rule— evidence is admissible if it "inevitably would have been discovered" through lawful means. *See Nix v. Williams*, 467 U.S. 431, 441-42 (1984); *Murray v. United States*, 487 U.S. 533, 539 (1988). In other words, the doctrine applies when evidence uncovered during an unlawful search

would have been found during a subsequent, lawful search that would have taken place even absent the unlawful conduct. *See United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002).

Here, the Court has determined that officers had probable cause to arrest Defendant Mandarakas. Once Mandarakas was lawfully arrested, officers were permitted to conduct a search incident to arrest of his person.[8] That search necessarily would have included retrieving the keys to the Kia Forte, which were in Mandarakas' right pocket. *See United States v. Alexander*, 740 F. Supp. 437 (N.D. Ohio 1990) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 34-35 (1979) ("Police officers are authorized to conduct a search of a suspect's person, including the person's pockets, incident to a lawful arrest.")); *see also United States v. Yancy*, No. 11-20108-STA, 2012 WL 1252526, at *9 (W.D. Tenn. Apr. 13, 2012), aff'd, 725 F.3d 596 (6th Cir. 2013) (holding that even if keys in defendant's pocket "had not been confiscated at the outset of the detention, the police would have inevitably discovered the keys once Defendant was placed under arrest")).

The video footage of Mandarakas' arrest confirms that officers performed a search incident to arrest that would have uncovered the keys. (ECF No. 91, Exhibit 5 "110341TRENT13_LL00013"). The footage shows that around 11:31

[8] *See United States v. Montgomery*, 377 F.3d 582, 586 (6th Cir.2004) (explaining that under the search incident to a lawful arrest exception, officers may conduct a full search of an arrestee's person incident to a lawful custodial arrest).

AM, Mandarakas is arrested and escorted to a police vehicle. *Id*. at 11:31:23. The arresting officer then asks, "and for sure no weapons on you, or nothing in the car that you had—the rental car?" Mandarakas responds, "no." The officer then checks Mandarakas' pants and coat pockets. *Id.* at 11:31:31. After directing Mandarakas to sit in the back seat of the police car, the officer asks, "and do those keys go to that car?" Mandarakas answers, "yes."

Thus, even assuming the keys were removed prematurely, their discovery was inevitable.

**2. Search of the Kia Forte**

Mandarakas nevertheless contends that the Kia Forte was unlawfully searched. The Government responds that the search was justified on three independent grounds: (1) the car was an instrument of his crime and subject to seizure under the automobile exception; (2) officers had probable cause to believe that the vehicle contained evidence of stalking, which independently authorized a search under the automobile exception; and (3) Trenton Police Department's standard operating procedures required impoundment and an inventory upon Mandarakas' arrest. The Court is persuaded by the Governments arguments.

*Automobile Exception*

The Fourth Amendment generally requires officers to obtain a warrant before conducting a search. U.S. Const. amend. IV. But there are exceptions to

this requirement; one of them is the "automobile exception." *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). The automobile exception allows an officer to perform a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains evidence of criminal activity. *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). "This right extends to instances where the vehicle itself, as opposed to its contents, is the contraband sought." *United States v. Simpson*, 138 F.4th 438, 444 (6th Cir.), cert. denied sub nom. *Wynn v. United States*, 146 S. Ct. 276 (2025) (citing *Florida v. White*, 526 U.S. 559, 565 (1999). Accordingly, police officers may lawfully seize an automobile from a public place if they have probable cause to believe that the vehicle itself is contraband. *White*, 526 U.S. at 566. Once the vehicle is impounded, officers may conduct an inventory search without violating the Fourth Amendment. *United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007).

"Probable cause is not a high bar." *United States v. Woods*, 168 F.4th 952, 954 (6th Cir. 2026) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (cleaned up). To search a place, officers need only a "fair probability" that they will find evidence of a crime there. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). Here, Trenton police officers had probable cause to seize and search the Kia Forte. During Mandarakas' detention, officers learned that a tracking device had been used to stalk and surveille AV-1, and that device was turned over

to police by W2 and W3. Video footage of the detention also shows that Mandarakas gave evasive and deceptive answers to officers' questions about his method of transportation and about the Kia Forte itself. The following two-minute exchange provided facts that contributed to the officers' development of probable cause to search the vehicle:

> Officer #1 (11:10:15): So, the car that you're in, what'd you arrive in? What have you been driving?
>
> Mandarakas (11:10:19): Um, my personal car.
>
> Officer #1 (11:10:21): What kind of car is that?
>
> Mandarakas (11:10:23): It's . . . a Hyundai.
>
> Officer #1 (11:10:26) : Hyundai? What kind of plate on it?
>
> Mandarakas (11:10:29): I don't think that I know.
>
> Officer #1 (11:10:30): Is it a New Jersey plate? If it's your car, where did you register it?
>
> Mandarakas (11:10:33): Yeah . . . I mean, yeah.
>
> Officer #2 (11:10:36): Where'd you park?
> [ . . . ]
>
> Mandarakas (11:10:44): I just don't know why I'm being interrogated about it.
>
> Officer #1 (11:10:45): I just explained to you that you have an ex-girlfriend that you're coming to see in Trenton—
>
> Officer #2 (11:10:53): She's made it very clear that she wants nothing to do with the relationship, its done.

Officer #1 (11:10:56): — and you're showing up in places that—arguably, you're stalking her, man. And my concern is that you're trying to do more.

Mandarakas (11:11:04-21): No, no, I'm not trying to do more. [. . .] I'm familiar with this area, okay? So, the first thing I did was, I went to Canada to close a bank account—

Officer #1 (11:11:26) Who's car? Who's car were you in?

Mandarakas (11:11:27): My car.
[ . . . ]

Officer #1 (11:11:34): The keys that you've had in your pocket, what about that car?

Mandarakas (11:11:38): That's a rental.

Officer #1 (11:11:39): Why would you rent a car if you've had a car up here?

Mandarakas (11:11:41): I was having trouble with it.

Officer #1 (11:11:43): Where's your car at now? Your New Jersey car?

Mandarakas (11:11:46): It's parked.

Officer #2 (11:11:46): Where at?

Mandarakas (11:11:47): Like, where I, where I rented it.

Officer #1 (11:11:50): Where'd you rent it at?

[. . .]

Mandarakas (11:11:55): I—I—I don't get why I'm—

Officer #1 (11:11:58): See this is why I know why you're here. [ . . .] See, here's what I'm going to do, I'm going to go run that plate on that rental and find out where your car is rented. And I'm going to go check that place and your vehicle is not going to be there. I know that, you know that.

> So, how did you get here? Or, you did, and you're hiding your vehicle so that she doesn't know—because she knows what car you drive, and she's worried about you being up here. You're doing exactly what we say you're doing. You're stalking this young lady.
>
> Mandarakas (11:12:30): Alright, I don't want to stalk her.
>
> Officer #1 (11:12:33): Okay, but you're doing it.
>
> Mandarakas (11:12:34): Alright, I don't want to do that. And I have no animosity with her family or anything.
>
> Officer: #1 (11:12:41): These situations escalate quickly, and people can get hurt. That's why we're here right now. I gotta make sure you're not going to hurt yourself, or you're not going to hurt this young lady, or anybody that's associated with your four-year relationship that you seem to can't get over.

(110341TRENT13_LL0013-001.)

This brief exchange highlights Mandarakas' nervous behavior and inconsistent explanations regarding the Kia Forte. When considered alongside the stalking device provided by W2 and W3, these circumstances established probable cause for officers to believe that additional tracking equipment or weapons might be inside the vehicle. That concern is reflected in Officer #1's statement that his questions about the vehicle's location were intended to ensure Mandarakas posed no danger to AV-1, and to confirm that he was not "trying to do more" than stalk her. The Court therefore finds that the officers had probable cause to search the vehicle for weapons or other evidence of a crime under the automobile exception.

*Inventory Search*

Additionally, as the Government points out, a vehicle may be seized when a suspect's vehicle is the contraband sought, and officers can conduct a lawful inventory search once the vehicle is impounded. (*See* ECF No. 159, PageId.1138. (citing *Simpson*, 138 F.4th at 444; *Smith*, 510 F.3d at 651)).

Here, as discussed, Trenton police officers possessed probable cause to believe that the Kia Forte contained evidence of criminal activity. And, given the nature of the offense—stalking—the officers naturally had probable cause to believe that the vehicle was used to facilitate the crime. Eyewitness testimony from W2 and W3 supported this conclusion. They reported that they intentionally drove the tracked vehicle to the church and observed Mandarakas arrive shortly thereafter, circle AV-1's vehicle twice, and engage in behavior consistent with surveillance. These facts reinforced the officers' belief that Mandarakas was using the Kia Forte to stalk AV-1.

The statements of Officer # 1 throughout the recorded conversation also confirm this. When Mandarakas hesitated and failed to answer a question about the Kia Forte, Officer #1 remarked:

> "See this is why I know why you're here. [ . . .] [Y]ou're hiding your vehicle so that she doesn't know—because she knows what car you drive, and she's worried about you being up here. You're doing exactly what we say you're doing. You're stalking this young lady."

(110341TRENT13_LL0013-001.)

Taken together, these observations not only established probable cause to search the Kia Forte; they also justified the officers' decision to seize and impound the vehicle under department policy, which in turn permitted a lawful inventory search.

As the Government notes, the Supreme Court has long recognized that law enforcement may conduct a warrantless inventory search of a lawfully seized vehicle if the search follows standardized criteria or an established routine. *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976); *Colorado v. Bertine*, 479 U.S. 367, 371-74 (1987). Here, Trenton police conducted an inventory search of Mandarakas' vehicle pursuant to the Department's standard operating procedures ("SOP") 601.1. (*See* ECF No. 159-7, PageID.1223.) SOP 601.1 allows Trenton police officers to perform an inventory of the contents of a vehicle when "the operator is removed . . . through arrest/detention . . . or when a vehicle has been deemed abandoned. SOP 601.1 notes that an exception may apply if the operator designates a "passenger" to release the vehicle to at the scene of the arrest. This exception does not apply to Defendant Mandarakas, as he had no passengers to whom he could release the vehicle. Accordingly, Trenton police officers lawfully impounded his vehicle and conducted a lawful inventory search under SOP 601.1.

Trenton Police officers lawfully seized and searched the Kia Forte. Defendant's motion to suppress all evidence deriving from this search is **DENIED**. (ECF No. 91.)

**C. Motion to Suppress — Search of the Hyundai Elantra**

Mandarakas' third motion seeks suppression of all evidence obtained from the search of his personal vehicle, a Hyundai Elantra. He argues that the affidavit and search warrant were deficient, that the magistrate judge was unneutral and abandoned his judicial role, and that the good faith exception does not apply.

**1. The Affidavit and Search Warrant**

Generally, the Fourth Amendment requires officers to obtain a warrant before conducting a search. *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007). A valid warrant under the Fourth Amendment requires three things. First, a neutral, disinterested magistrate must issue the warrant. *Dalia v. United States*, 441 U.S. 238, 255 (1979). Second, the warrant or warrant affidavit must show that there is probable cause to believe that the evidence being sought will further the "apprehension or conviction" for a specific offense. Finally, the warrant must describe with particularity what officers may search and seize." *Id.*

Mandarakas alleges that the warrant failed to satisfy each requirement. His arguments fail.

First, he offers no credible evidence that Magistrate Judge McNally failed to act in a neutral or detached manner. He alleges that Judge McNally was present during the execution of the search because the warrant was served "on-location." (ECF No. 112, PageID.754-55.) That interpretation is incorrect. Serving a warrant "on location" does not mean that the issuing judge physically delivered it to police officers, nor does it suggest that Judge McNally participated in the search.[9] Rather, it means that police officers went to the location—rather than the magistrate judge, as Defendant suggests—to officially show and carry out the warrant, instead of providing notice through other means. Nothing about the warrant being served on location suggests that Judge McNally was present at the scene, participated in the search, or otherwise abandoned his judicial role.

Mandarakas also claims that signatures on the warrant form were forged because the signature in the space designated for the "prosecuting official" does not resemble Judge McNally's name. *Id.* at 755-756. This argument rests on a

---

[9] Defendant Mandarakas argues that "the police report" proves that the warrant was served on-location and that Judge McNally was on-site during the execution of the search. The record contains several police reports. Mandarakas did not provide a citation to a specific report, but the Court assumes that he is referring to the Detective Bureau Investigation Report issued by the Trenton Police Department. (ECF No. 85-2.) This report, authored by Sergeant Driscoll, contains the following language: "On December 26, 2023, I authored a search warrant for Mandarakas' Elantra, which was sworn and signed by the 33rd District Judge Michael McNally. Lt. Grignon and I served the search warrant in the parking lot of the Hertz Rental lot, where the vehicle was located." (*Id.*, PageID. 498.)

misunderstanding. Judge McNally is the issuing magistrate, not the prosecuting official.

Second, the warrant was supported by probable cause. When a search warrant is issued by another judicial officer, a reviewing court must afford "great deference" to the probable cause determination that was made. *Smith*, 510 F.3d at 652 (citing *United States v. Leake*, 998 F.2d 1359, 1363 (6th Cir. 1993)). Accordingly, a magistrate judge's decision to grant a search warrant should be reversed "only . . . if it was arbitrarily exercised." *Smith*, 510 F.3d at 652. But Courts may not engage in a "line-by-line scrutiny of the warrant application's affidavit." *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). Instead, an affidavit in support of a search warrant must be judged "holistically on what the affidavit does show, instead of focusing on what the affidavit does not contain, or the flaws of each individual component of the affidavit." *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019). Finally, there must be a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (internal quotation marks omitted).

Here, the affidavit supports a finding that the warrant was supported by probable cause. As noted, probable cause is not a high bar. The affidavit contains detailed eyewitness testimony, statements from the victim, reports of a recovered

tracking device, and observations from responding officers. Taken together, these details provide a picture of how Mandarakas used a Hertz rental car ("Kia Forte") to stalk the victim on December 25, 2023.

The affidavit also describes evidence recovered from the Kia Forte that links the rental to Defendant's Hyundai Elantra and supports a belief that additional evidence may be found there. Specifically, the Kia Forte revealed "a [second] tracking device, three cellphones, a large amount of U.S. and Canadian currency ($12,586.00), printed maps to different locations in and outside of the United States, [ . . . ], keys to another vehicle, and a Hertz Rental receipt." (ECF No. 113-1, PageID.786.) Trenton Police officers visited the location on the receipt and found Defendant's Hyundai Elantra. *Id.*

Notably, Detective Sergeant Driscoll authored the affidavit. He writes that he has 19 years of law enforcement experience and has investigated numerous criminal cases. He further explains that, based on his training and experience, "suspects frequently conceal evidence in their vehicles and utilize them in committing crimes." (*Id.* at 785.) His experience, in addition to the evidence found in the Kia Forte, satisfies the nexus requirement for probable cause. *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 644 (6th Cir. 2003) (quoting *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) ( "The issuing judge or magistrate 'may give considerable weight to the conclusion of experienced law

enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept.")).

Viewed collectively, the four corners of the affidavit establish probable cause to believe that "weapons and items to assist in a possible abduction" would be found in Mandarakas' personal vehicle.

Finally, the warrant was sufficiently particular. The Fourth Amendment requires warrants to particularly describe the place to be searched, and the persons or things to be seized. *United States v. Gardiner*, 463 F.3d 445, 471 (6th Cir.2006) (internal citation omitted). Accordingly, the warrant "must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *Id.* A description is valid if "it is as specific as the circumstances and the nature of the activity under investigation permit." *United States v. Hanna*, 661 F.3d 271, 286 (6th Cir.2011)

Here, the affidavit described the place to be searched with specificity: "2010 Hyundai Elantra, VIN#KMHDU4AD4A, New Jersey license plate#VVJ20M currently located at 23955 Allen Road, Woodhaven, MI 48183 (Hertz Rental). (ECF No. 113-1, PageID.785.) The affidavit likewise described the property to be searched for and seized with particularity, again identifying the Elantra and

specifying that officers were authorized to search for "possible weapons and items to assist with a possible abduction of a victim." *Id.*

Mandarakas argues that the warrant is invalid because the description of "possible weapons and items" was too vague. However, as the Government explains, a generic description will suffice when a more specific description is unavailable. (ECF No. 159, PageID.1154 (citing *United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir. 1991)). The Government provides a persuasive explanation for the description used:

> At the time the warrant was sought, officers had probable cause to believe the Elantra contained weapons and items intended to facilitate an abduction — but they could not predict with precision what form those items would take. An abduction can be carried out with any number of instruments — restraints, weapons, communication devices, or other tools — and officers cannot be expected to enumerate every possible item before conducting the search. A general description tailored to the crime is not only permissible under these circumstances; it is the only description available.

(ECF No. 159, PageID.1154 -55.)

Accordingly, the description satisfied the particularity requirement.

The Court finds no support for Mandarakas' claims that the issuing magistrate was not neutral, that probable cause was lacking, or that the warrant failed to describe the place and items with particularity. Because the record reveals no arbitrary exercise of authority by Magistrate Judge McNally, the warrant stands.

**2. Good Faith Exception**

Even if Mandarakas' challenges had merit, the *Leon* good-faith exception would bar suppression. In *United States v. Leon*, the Supreme Court held that the exclusionary rule does not prohibit "admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. 897, 905 (1984). The relevant inquiry is an objective one, asking, "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23.

The good-faith exception does not apply, however, in four circumstances: 1) where the supporting affidavit contained knowing or reckless falsity; 2) the issuing magistrate wholly abandoned his or her judicial role; 3) the affidavit is "so lacking in probable cause as to render official belief in its existence entirely unreasonable;" or 4) where the officer's reliance on the warrant was neither in good faith nor objectively reasonable. *United States v. Hython*, 443 F.3d 480, 484 (6th Cir.2006).

The Sixth Circuit described the objectively reasonable exception in United *States v. Baker*. 976 F.3d 636 (6th Cir. 2020). It explained that:

> Given that police misconduct must qualify as "purposeful or flagrant" to justify suppression, this exception applies only if the affidavit can be described as "bare bones[.]" The classic bare-bones affidavit asserts only an officer's conclusion that probable cause exists "without any statement of adequate supporting facts." For search warrants, we have found this test met when the affidavit lacked any allegation tying illegal activity to the place to be searched, or when it contained no basis to believe that contraband would still remain there. An affidavit seeking a search warrant is not bare bones, by

> contrast, if it contains "some modicum of evidence, however slight," "between the criminal activity at issue and the place to be searched[.]"

*Baker*, 976 F.3d at 647 (citations omitted).

Here, Mandarakas does not offer any credible arguments suggesting that the supporting affidavit contained knowing or reckless falsity, that Magistrate Judge McNally wholly abandoned his judicial role, or that the officers lacked good faith. He alleges that an officer's reliance on the affidavit could not be objectively reasonable, but the affidavit easily surpasses the *Baker* threshold.

The affidavit includes reports that Mandarakas had engaged in unwanted contact with the victim since November 2023; that the victim believed Mandarakas was stalking her and had placed a tracking device on her vehicle; firsthand observations from W2 and W3 that Mandarakas appeared at St. Joseph Catholic Church after they intentionally drove the tracked vehicle there; observations that he arrived in a black Kia Forte and circled the victim's car twice before parking; and observations from Trenton police officers that Mandarakas' key revealed that the Kia Forte was a Hertz rental.

The affidavit also details substantial evidence recovered from the rental car suggesting that additional evidence could reasonably be found in Mandarakas' personal vehicle: a tracking device, a large amount of U.S. and foreign currency, printed maps to locations inside and outside the United States, three cell phones,

keys to another vehicle, and a Hertz rental receipt that led officers to locate the Hyundai at that location.

Taken together, these facts provide more than "some modicum of evidence" linking Mandarakas' suspected criminal activity to the vehicle to be searched. The affidavit is not bare bones, and—even assuming *arguendo* that the warrant was defective—a reasonably well-trained officer would not have known that the search was illegal despite the magistrate's authorization. Therefore, Defendant's motion to suppress evidence found in the Hyundai Elantra is **DENIED**. (ECF No. 112.)

For the reasons explained above, Defendant's motions to quash his arrest and suppress evidence (ECF Nos. 84, 91 and 112) are **DENIED**.

## III. Motions for Pretrial Release

On January 10, 2024, Magistrate Judge Kimberly G. Altman signed an order of detention pending trial as to Defendant George Mandarakas. (ECF No. 12.) Defendant Mandarakas, acting pro se, filed a motion for revocation of the detention order on April 10, 2024, to which the Government responded on April 24, 2024. (ECF Nos. 25 & 29.) The undersigned issued an opinion and order denying his motion on May 31, 2024. (ECF No. 33.) Defendant Mandarakas appealed, and the United States Court of Appeals for the Sixth Circuit entered an order affirming the Court's decision on September 10, 2024. (ECF No. 50.)

In the months following the Sixth Circuit's order, Defendant Mandarakas filed several motions challenging the underlying detention order. (*See* ECF Nos. 80, 94, 97, 109, 120, 122, 124, 133, & 137.) The Government responded to each motion in its March 23, 2026, omnibus response brief. (ECF No. 159.) Defendant filed a reply on May 5, 2026, after receiving several deadline extensions. (ECF No. 167.)

Defendant Mandarakas' motions advance various confinement-related challenges. The Government addressed the motions by organizing them into three categories: (1) challenges to the underlying detention order and requests to reopen the detention hearing; (2) challenges to the length of his detention and Due Process concerns; and (3) challenges to the conditions of his confinement. After careful consideration of the record, the relevant law, and the parties' briefs, the Court denies Defendant's motions. The Court will address each motion category in turn.[10]

**1. New Information**

A federal district court may reopen a detention hearing if: (1) new information exists that was unknown to the movant at the time of the hearing and (2) the new information is material to release conditions regarding flight or

[10] Defendant Mandarakas also advanced several, miscellaneous arguments that do not fit neatly in these categories. The Court will address those arguments in its third section below.

dangerousness. *See* 18 U.S.C. § 3142(f)(2); *United States v. Watson*, 475 F. App'x 598, 600 (6th Cir. 2012). The new information must be of a nature that would increase the likelihood that he will appear at trial and would show that he is less likely to pose a danger to the community." *Id.* Qualifying new information "requires a showing of truly changed circumstances or a significant event." *United States v. Bothra*, No. 19-1953, 2019 WL 8883664, at *1 (6th Cir. Nov. 5, 2019) (citations omitted).

Defendant Mandarakas has failed to present any legally cognizable "new information." He does not describe, in any of his motions, the existence of materially changed circumstances or a significant event that would warrant reopening a detention hearing.

His closest attempt at meeting this burden is found in his reply brief, where, he argues that "newly discovered digital evidence" (text conversations from his personal cell phone),[11] undermines the Court's assessment of his flight risk and dangerousness. (ECF No. 167, PageID.1286-89.) Even putting aside that this argument was untimely raised and is therefore waived, the messages do not qualify as "new information" under 18 U.S.C. § 3142(f)(2). These text messages existed

[11] Notably, while Defendant Mandarakas offers bates numbers for the text messages, he failed to attach any exhibits to his brief. The Court will not consider evidence that was not made part of the record.

well before the Court's initial detention hearing on January 10, 2024,[12] and Defendant Mandarakas clearly had knowledge of this information because the messages were sent or received through his personal cell phone. Therefore, this information is insufficient to reopen the detention hearing. *See Watson*, 475 F. App'x at 600 (noting that information known to the defendant at the time of the hearing cannot be "new information" for the purpose of reopening a detention hearing).

The Court rejects the portions of Defendant's motions for pretrial release that rest on these grounds. (ECF Nos. 80, 94, 97, 109, 120, 122, 124, 133, 137.)

**2. Due Process Concerns**

Mandarakas argues that continued pretrial detention violates his Fifth Amendment right to due process. He contends that the length of his pretrial detention is excessive, that detention has deprived him of "the right to have an income" in order to secure funds for a private defense team, and that continued detention is unfairly prejudicing his defense because his communications are monitored by the BOP. (ECF No. 80, PageID.429-30; No. 97, PageID.654.)[13]

---

[12] Mandarakas provided dates for the text messages, all of which were either sent by Mandarakas himself or received from a third party between September 2023 and December 2023. (*See* ECF No. 167, PageID.1287-89.)

[13] Defendant Mandarakas also alleged due process violations in his third renewed motion to revoke the detention order (ECF No. 109). This motion merely restated claims made in his initial motion to revoke the detention order (ECF No. 25), where he disagreed with Magistrate Judge Kimberly Altman's assessment of the conditions of release factors under 18 U.S.C. § 3142(g).

Pretrial detention violates the Fifth Amendment when it amounts to "punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Sixth Circuit has identified four factors to help courts determine if pretrial detention is unconstitutionally excessive: (1) the length of the detention; (2) the extent of the prosecution's responsibility for the delay of the trial; (3) the gravity of the charges; and (4) the strength of the evidence upon which the detention was based. *Watson*, 475 F. App'x 598, 601 (2012) (citing *United States v. El-Hage*, 213 F.3d 74, 79 (2d Cir. 2000)).

First, the "length of pretrial detention is not dispositive, and will, by itself, rarely offend due process." *Watson*, 475 F. App'x at 601 (citations omitted). Here, Defendant Mandarakas has been detained for 30 months. In *Watson*, the defendant had been detained for nearly two years. However, the Sixth Circuit noted that "[c]ourts have found lesser periods of detention to be a violation of due process, but they have also found lengthier periods that were not in violation of the Fifth Amendment." *Watson*, 475 F. App'x at 602 (internal citations removed.) Therefore, the Sixth Circuit court moved forward by evaluating the other factors "in conjunction with the length of detention" in order to assess whether a violation occurred. This Court will do the same.

---

Those arguments were rejected by this Court, and the decision was affirmed on appeal. (ECF Nos. 33 & 50.) They will not be revisited here.

The second factor, the extent of the prosecution's responsibility for the delay, does not weigh in Defendant Mandarakas' favor. A review of the procedural history of this matter demonstrates that the government bears little to no responsibility for the delay. From April 4, 2024, to present, Defendant Mandarakas filed over 60 pre-trial motions, with many including motions to extend deadlines or continue dates. Mandarakas has cycled through five different attorneys over the course of his detention, and his trial date has been rescheduled ten times. (*See* ECF Nos. 17, 24 32, 47, 49, 57, 69, 86 132, 170.) Each time Defendant has been appointed new counsel, at his request or concurrence, the Court has advised Defendant that the appointment of new counsel would delay his proceedings.

Defendant also alleges that prior discovery disputes and related issues — including allegations that the Government intentionally concealed and delayed producing discovery—prove that the Government is primarily responsible for the delay. (ECF No.167, PageID.129.) The Court is not persuaded that the Government intentionally interfered with Defendant's access to discovery and Defendant has not provided evidence supporting any claim of intent

The final two *Watson* factors — the gravity of the charges and the strength of the evidence upon which the detention was based — also weigh against Defendant Mandarakas. He is charged with stalking, which carries a maximum of 10 years if

the offender uses a dangerous weapon during the offense, and attempted kidnapping, which carries a statutory maximum term of 20 years in prison. *See* 18 U.S.C. §§ 2261(b), 2261(A)(2)(B), and 1201(d).

The strength of the evidence to support the initial detention order was overwhelming. (*See* ECF No. 29, at PageID.132-36.) At the detention hearing, the Government offered evidence including, but not limited to:

1) Reports from the victim, "AV-1" that a friend of Mandarakas warned her that Mandarakas was watching her house and looking for a way to track her;

2) Reports from "AV-1" that a tracking device was found taped to her car;

3) Reports from a friend of Mandarakas that, within the months leading up to the alleged attempted kidnapping, Mandarakas repeatedly made comments about a man who kidnapped his girlfriend and took her to Mexico and how the relationship worked out in the end;

4) Reports that, on or about December 23, 2023, Mandarakas told the friend that he was serious about kidnapping AV-1;

5) Mandarakas' presence at a local church after W2 and W3 intentionally drove AV-1's car, with the tracker, to the location;

6) A search of Mandarakas' car revealing that he had over $12,000 in Canadian and U.S. currency, multiple cellphones, another tracking device, boat sale advertisements and sailing maps stashed in his vehicle; and

7) A two-page handwritten checklist in the vehicle with phrases such as, "cash only," "multiple burner phones. Don't activate until you are already on the run and left your other phone behind," "sailboat in cash," "change legal name to Josh Tullis."

Mandarakas argues that the strength of the evidence factor weighs in his favor because the "evidence collected had no relation to any crime intended for [AV-1]." For the various reasons stated throughout this ruling, the Court is not persuaded by this argument.

Accordingly, after weighing the *Watson* factors, the Court finds that the results do not establish a due process violation. The Court rejects Defendant's motions for release to the extent that they rely on this ground.

**3. Remaining Arguments for Pretrial Release**

Mandarakas' remaining arguments for pretrial release suffer as well. He argues that release is warranted because detention has caused him to suffer from "asthma, skin infections, cardiovascular issues, gastrointestinal issues, dizziness, numbness, and neurological problems." (ECF No. 80, PageID.431; ECF No.167, PageID.1289-90.) He also alleges that his family is experiencing emotional and financial hardship due to his incarceration. (ECF No.80, PageID.430-31; ECF No. 167, PageID.1290-91.)

It is true that a district court may release a defendant "under appropriate conditions . . . if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." 18 U.S.C. § 3145(c). But to qualify for release under this "exceptional reasons" test, Mandarakas must first show that he is not a danger to the community.

As explained, Mandarakas has not carried this burden; nor has he presented any "new information" to change the Court's initial analysis of dangerousness. Therefore, the Court need not consider whether exceptional reasons justify his release. Even setting aside that threshold issue, both of Mandarakas' arguments are without merit. Courts in this circuit have consistently held that family hardship is not an adequate reason to justify release. *See United States v. Miller*, 568 F. Supp. 2d 764, 777 (E.D. Ky. 2008) (citing *United States v. Cook*, 42 F. App'x 803, 804 (6th Cir. 2002) and rejecting defendant's 18 U.S.C. § 3145(c) motion for release due to "family hardship")); *see also United States v. Burnett*, 76 F. Supp. 2d 846, 849 (E.D. Tenn. 1999) (finding that family hardship is not an exceptional circumstance that justifies release because "incarceration regrettably inflicts family hardship on many, if not most, defendants"). Likewise, courts have also found that nonterminal medical conditions are not exceptional reasons to justify release. *See United States v. Parker*, No. 1:10-CR-28, 2011 WL 672309, *2 (E.D. Tenn. Feb. 18, 2011) (collecting cases); *see also United States v. Majied*, No. 08-20181, 2008 WL 4427631 (E.D. Mich. Sept. 30, 2008) (finding the defendant's skin condition insufficient).

In Mandarakas' final argument for pretrial release, he contends that his various medical conditions are not being properly treated and that this alleged mistreatment constitutes cruel and unusual punishment in violation of the Eighth

Amendment. The Government responds that these challenges are not properly raised in a bond motion and do not provide a basis for pretrial release. (ECF No. 159, PageID.1120–23.) The Court agrees. Defendant Mandarakas identifies no authority suggesting that a motion for bond is an appropriate vehicle for advancing Eighth Amendment claims. Courts have long recognized that such claims are properly pursued through a separate civil action. This court finds no reason to depart from this standard.

For the reasons stated above, the Court rejects Defendant Mandarakas' arguments and **DENIES** his various motions for reopening the detention hearing and revoking the detention order. (ECF Nos. 80, 94, 97, 109, 120, 122, 124, 133, 137.) He shall remain in BOP custody.

## IV. Motions to Dismiss

Defendant Mandarakas has filed several motions to dismiss, including: (1) a motion to dismiss for selective prosecution; (2) a motion to dismiss his attempted kidnapping count due to an unqualified witness; (3) a motion to dismiss for lack of subject matter jurisdiction; and (4) a motion to dismiss for due process violations. (ECF Nos. 102, 130, 134, and 104.)

All motions have been fully briefed. (*See* ECF Nos. 159; 167.) The Court will address each motion in turn.

**A. Motion to Dismiss for Selective Prosecution**

Defendant Mandarakas alleges that the Government selectively prosecuted him based on his Catholic faith and that his indictment should therefore be dismissed with prejudice. (ECF No. 102.)

The standard for selective prosecution is a demanding one. *US. v. Armstrong*, 517 U.S. 456, 463 (1996). To prevail, a defendant must show that the Government's prosecutorial decision had both a discriminatory intent and a discriminatory effect. *United States v. Jones*, 399 F.3d 640, 645 (6th Cir. 2005). To establish discriminatory intent in a case alleging selective prosecution based on religion, a defendant must show that the prosecutorial decision was motivated by religious animus; to establish discriminatory effect, a defendant must demonstrate that similarly situated individuals of a different religion were not similarly prosecuted. *Id.* (discussing the standard in the context of race-based selective prosecution).

Prosecutors, however, have broad discretion when determining which cases to prosecute." *United States v. Brimite*, 102 F. Appx. 952, 955 (6th Cir.2004) (citation omitted). As long as the Government has probable cause to believe that an accused has committed an offense defined by statute, decisions regarding whether to prosecute and what charges to file generally rest entirely within the prosecutor's discretion. *Id.*

Defendant Mandarakas has not met the demanding standard for establishing selective prosecution. He fails to identify a similarly situated individual of a different faith who received more favorable treatment. Mandarakas attempts to satisfy this burden by comparing himself to the defendant in *United States v. Nam Quoc Hoang*. No. 1:16-CR-193, 2017 WL 1197243 (E.D. Va. Mar. 31, 2017). In that case, the defendant stalked his ex-girlfriend, published sexually explicit videos of her online, broke into her home, stole her belongings, struck her in the face with a handgun, and forced her to drive at gunpoint. Mandarakas takes issue with the fact that—despite being charged with eight federal offenses—the defendant was not charged with attempted kidnapping.

Defendant Nam Quoc Hoang is not a sufficient comparator. The circumstances in his case were materially different. More importantly, as the Government notes, the *Hoang* opinion does not reference the defendant's religion at all. Mandarakas bears the burden of identifying a similarly situated individual of a different faith who was not similarly prosecuted. He has not done so.

Moreover, the record demonstrates that the Government had probable cause to believe that Mandarakas engaged in stalking and that he attempted to kidnap AV-1. Mandarakas offers no credible evidence suggesting that the prosecution's decision was motivated by discriminatory intent. His remaining arguments—that he was arrested at a Catholic church, that a presidential speech referenced

Catholics being "under attack," that contacting AV-1 and her family was a "bold declaration" of his faith, that he served as an altar boy for ten years, and that he attended Mass solely to celebrate the birth of Jesus—do not meaningfully contribute to establishing discriminatory intent or discriminatory effect.

Therefore, the Court **DENIES** his motion to dismiss for selective prosecution. (ECF No. 102.)

### B. Motion to Dismiss Attempting Kidnapping Count Based on an Unqualified Witness

Defendant Mandarakas asks the Court to dismiss the attempted kidnapping charge with prejudice "due to unqualified witness testimony," or, in the alternative, to hold a competency hearing to "evaluate the witness's ability to testify." (ECF No. 130, at PageID.904) He alleges that the witness ("BV") who alerted AV-1 that Mandarakas might have plans to kidnap her is not credible because BV allegedly suffers from alcoholism and mental instability. *Id.*

The Government responds that Mandarakas' arguments conflate the concepts of credibility and competency, and that a challenge to either is not a proper basis to dismiss the charge. (ECF No. 1191-93.)

The Court agrees with the Government. Mandarakas' challenges to the witness's credibility or competency are best reserved for cross-examination at trial. Mandarakas cites no authority to support his position that a charge in an indictment may be dismissed based on a witness's credibility. Federal courts have

consistently held that credibility assessments are factual determinations that a court should not resolve on a motion to dismiss. *United States v. Russell*, 2013 WL 4517773 (D. Me. Aug. 26, 2013) (citing *United States v. Maceo*, 873 F.2d 1, 2-3 (1st Cir. 1989) (holding that "an attack on the credibility of a single government witness does not warrant dismissal of [an] indictment" and that once a jury has returned an indictment, "the matter must be resolved at trial on the merits."); *see also Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995) ("It is not the function of the court to weigh evidence or evaluate the credibility of witnesses[.]"); *United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011), as amended (Apr. 20, 2011) (reviewing legal principles that govern motions to dismiss indictments and noting that "evidentiary questions—such as credibility determinations and the weighing of proof—should not be determined at the stage.") (brackets removed).

Accordingly, the Court **DENIES** Defendant's motion to dismiss the attempted kidnapping charged based on an "unqualified witness." (ECF No. 130.)

**C. Motion to Dismiss for Lack of Subject-Matter Jurisdiction**

Defendant Mandarakas' third motion to dismiss challenges the Court's jurisdiction. He argues that the "Government's prosecution constitutes an unconstitutional encroachment upon State sovereignty and violates the long-standing Domestic Relations Exception to federal jurisdiction and the principles of

Comity and Res Judicata." (ECF No. 134, PageID.920.) These are not legitimate arguments and have no rational connection to the facts in this case.

It is well established that the United States district courts have original and exclusive jurisdiction over all violations of the laws of the United States. U.S. Const. Art. III, § 2, cl. 1; 18 U.S.C. § 3231. Mandarakas is facing two federal charges: (1) Stalking, pursuant to 18 U.S.C. § 2261A(a)(B); and (2) Attempted Kidnapping, pursuant to 18 U.S.C. § 1201(a), (d). (ECF No. 13, PageID.24.) The Court therefore has subject-matter jurisdiction. *See* United States v. *Titterington*, 374 F.3d 453 (6th Cir. 2004) (citing *Hugi v. United States*, 164 F.3d 378, 380 (7th Cir.1999) ("Subject-matter jurisdiction in every federal criminal prosecution comes from 18 U.S.C. § 3231, and there can be no doubt that Article III permits Congress to assign federal criminal prosecutions to federal courts. That's the beginning and the end of the 'jurisdictional' inquiry.").

The Court therefore **DENIES** Defendant's Motion to Dismiss for lack of subject matter jurisdiction. (ECF No. 134.)

**D. Motion to Dismiss the Indictment for Due Process Violations**

Defendant Mandarakas moves to dismiss based on the Government's alleged "continued noncompliance with discovery obligations and for its conscious efforts to withhold *Brady* material." (ECF No. 104, PageID.719.) The Court held status conferences on August 26, 2025, and September 25, 2025, to address Defendant

Mandarakas' discovery concerns. (*See* ECF No. 93, PageID.582-97; ECF No. 128.) At the September conference, the parties agreed on how to deliver any outstanding materials. (ECF No. 104, PageID.721.) On October 8, 2025, the parties filed a stipulated protective order to cover the materials. (ECF No. 99.)

The Court may dismiss an indictment where "outrageous government conduct" results in a violation of a defendant's right to due process. *United States v. Napier*, 787 F.3d 333, 341 (6th Cir. 2015). "[O]utrageous government conduct outside the grand jury process can result in dismissal on due process grounds if such conduct is so outrageous that it violates 'fundamental fairness' or is 'shocking to the universal sense of justice.' " *Id.* (quoting *United States v. Russell*, 411 U.S. 423, 432 (1973)). Because of "the strong public interest in prosecuting serious crimes, prejudice to the defendant must be shown before dismissal of an indictment would be warranted[.]" *United States v. Adamo*, 742 F.2d 927, 941 (6th Cir. 1984) (quoting *United States v. Nembhard*, 676 F.2d 193, 200 (6th Cir. 1982)).

The Government's failure to provide "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In his motion, Mandarakas does not identify specific documents; instead, he makes several broad references to "the evidence." Based on the Government's

briefing and transcripts of the status conferences, the Court understands Defendant to be referring to: (1) screen recordings of text messages between AV-1 and BV; (2) a recording of AV-1's 911 call on the day of Defendant's arrest; (3) "phone dumps"; (4) "FBI 302s" and (5) internet searches.

After reviewing the parties' arguments and the exhibits attached to the Government's response, it is clear that Defendant's motion lacks merit. Exhibit 9 shows that Defendant was offered access to the screen recordings as early as April 1, 2024, through the Government's first discovery production. (*See* ECF No. 159-10.) Exhibit 11 demonstrates that extracted data from Defendant's phone and laptop were produced in April 2024 and again on or about May 24, 2024. (*See* ECF No. 159-12, PageID.1239.) Defendant also alleges that the Government unlawfully withheld the recording of AV-1's 911 call, but Exhibit 12 shows that standby counsel first requested this item in July 2025, and the Government produced it—then reproduced it—in August and October 2025. *Id.* As for the remaining items ("FBI 302s" and "internet searches"), the Government stated that it did not understand what Defendant was referring to. (ECF No. 159, PageID.1205.)

Even assuming that these items were withheld, Defendant does not articulate their purported value or explain how their nondisclosure constitutes a *Brady* violation. As the Sixth Circuit has emphasized, "[a] party may not present a

skeletal argument, leaving the court to put flesh on its bones." *United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016). Defendant has not provided enough detail for the Court to determine what specific items he is referring to or whether any of them are exculpatory such that their nondisclosure would amount to a *Brady* violation.

The exhibits in the record refute any allegation of "outrageous conduct" by the Government. Defendant has had months—and in some instances, years—to review the materials at issue, and the Court finds no indication of prejudice arising from the timing or manner of their production. Accordingly, for the reasons stated, the Court **DENIES** Defendant's motion to dismiss based on alleged due process and *Brady* violations. (ECF No. 104.)

**V. Motion for Return of Property**

Defendant Mandarakas alleges that the Government has unlawfully retained the following items: $4,000 CAD, $8,000 USD, one Hyundai Elantra, "at least eight electronic devices, [ . . .] family heirlooms, college diplomas, bins of paperwork, winter jackets," and his daughter's toys. (ECF No. 135, PageID.929-30.) He seeks the return of these items pursuant to Federal Rule of Criminal Procedure 41(g).

The Government responds that most of the listed items are not—and have never been—in federal custody, and that any remaining items in its possession are

evidence in Mandarakas' case. Rule 41(g) permits "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property" to move for the property's return." Fed. R. Crim. P. 41(g). However, a court "cannot order the Government to return something that it does not have." *United States v. Buckner*, No. 13-20299, 2018 WL 2184357, at *4 (E.D. Mich. May 11, 2018); *see also United States v. Price*, 841 F.3d 703, 707 (6th Cir. 2016) ("[T]he federal government never possessed the property at issue, and the district court was correct to deny the motion.").

Defendant Mandarakas has not provided any evidence demonstrating that the property at issue is in the Government's possession. The Government states that the "Hyundai Elantra, gold pinky ring, family heirlooms, college diplomas, bins of paperwork, clothes, winter jackets" and Defendant's daughter's toys are not in its custody. (ECF No. 159, PageID1200-01.) In support, the Government submitted an exhibit identifying all items currently in its possession. (ECF No. 159-9, PageID.1229-30.) None of the items listed above appear in the exhibit.

As for the remaining items, the Government asserts that it has an ongoing interest in retaining them because they serve as evidence in Mandarakas' case. (ECF No. 159. PageID.1201-02.) The Sixth Circuit has held that "seized property, other than contraband, should be returned to its rightful owner once the criminal proceedings have terminated," *Savoy v. United States*, 604 F.3d 929, 932 (6th Cir.

2010), or "once the Government's need for it has ended." *United States v. Bowker*, 372 F.3d 365, 387 (6th Cir. 2004).

Here, as the Government notes, Mandarakas' case is ongoing, and the items in its possession are needed as evidence. Under these circumstances, the Government is not required to return the property. *United States v. Popham*, 382 F. Supp. 2d 942, 956 (E.D. Mich. 2005) ("[w]hen the Government has a continuing interest in the property, the property does not have to be returned. The Government can demonstrate a continuing interest by showing that the property is contraband or necessary for an ongoing investigation.")

Consequently, Defendant Mandarakas' motion for return of property (ECF No. 135) is **DENIED**.

## VI. Conclusion

For the reasons set forth above,

**IT IS ORDERED** that Defendant's motions (ECF Nos. 80, 83; 84, 91, 94, 97, 102, 104, 109, 112, 120, 122, 124, 130, 133, 134, 135 and 137) are **DENIED**.

**SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: August 20, 2026